## ADOPTION OF MARIO.[1]

No. 96-P-2073.

Suffolk. September 9, 1997. - November 10, 1997.

Present: WARNER, C.J., GILLERMAN, & GREENBERG, JJ.

*Parent and Child,* Care and protection of minor, Dispensing with parent's consent to adoption. *Minor,* Care and protection, Adoption. *Adoption,* Care and protection, Dispensing with parent's consent. *Evidence,* Child custody proceeding.

In a proceeding to dispense with parental consent to the adoption of a child, the judge's determination of the mother's unfitness was supported by clear and convincing evidence [770-772], and the judge properly relied on the mother's prior patterns of neglect and misconduct in determining her current unfitness and properly considered more recent reports regarding the mother's behavior [772-773].

There was no merit to a parent's contention, in a proceeding to dispense with her consent to the adoption of her child, that the Department of Social Services had failed to make the attempt required by statute to encourage and strengthen her family. [773-774]

PETITION filed in the Boston Division of the Juvenile Court Department on August 30, 1995.

The case was heard by *Mark E. Lawton,* J.

*Daniel Raphael Katz* for the mother.

*Katherine M. Potter* for the Department of Social Services.

*Susan R. Engstrom* for the child.

WARNER, C.J. The mother of Mario[2] appeals from a decision of the Juvenile Court under G. L. c. 210, § 3, entered April 24, 1996, adjudicating her son to be a child in need of care and protection and dispensing with her consent to his adoption.[3] She

---

[1]A pseudonym.

[2]Mario's father, whose rights were also terminated, is not a party to this appeal.

[3]On August 30, 1995, the Department of Social Services (department) filed a care and protection petition on behalf of Mario, and temporary custody was

argues that (1) the judge's finding of unfitness was not supported by clear and convincing evidence; (2) his reliance on past patterns of behavior rather than on recent improvements in parenting skills was improper; and (3) the Department of Social Services (department) failed to make the effort required by statute to encourage and strengthen her family. We affirm.

*Evidence of current unfitness.*

We first consider the sufficiency of the evidence of unfitness. Except for the mother's contention that the judge placed undue weight on her past pattern of drug abuse and child neglect in evaluating her fitness, she does not challenge his subsidiary findings, which include the following. Before Mario was born, his mother had given birth to three daughters, all of whom were placed in foster care. At the time of trial, two of the girls had been freed for adoption. The third, who was born with multiple medical problems, died in foster care.

Mario was exposed prenatally to methadone, alcohol, cocaine and nicotine. He was born on May 28, 1995, with a positive toxic screen for cocaine. His withdrawal symptoms were treated with methadone. Mario was also placed on AZT at birth, due to his mother's positive HIV status.

On May 30, 1995, a report pursuant to G. L. c. 119, § 51A, was filed on Mario's behalf, alleging that he was born with a positive toxic screen for cocaine and that his mother had also tested positive for cocaine. After an investigation, the allegations were found to be substantiated. Nevertheless, the mother was permitted to take Mario home. During the first two months of Mario's life, she refused to permit the visiting nurse who had been assigned to assist in his care to see him. Moreover, she and the baby lived in a small room in a boarding house. No crib or baby items were provided for Mario, and he slept with his mother in a single twin bed.[4]

The mother, who was twenty-seven years old at the time of trial, began using heroin at the age of fourteen. By her own admission, she had a longstanding substance abuse problem,

awarded to the department pursuant to G. L. c. 119, § 24. On February 5, 1996, the court allowed the department's motion to amend the care and protection petition to request termination of parental consent to Mario's adoption.

[4]Although not specifically included in the judge's findings, there is evidence in the record that the room was extremely unkempt, the door was not secure, and a hot plate was used for cooking, presenting a serious fire hazard.

and despite participation in a number of drug treatment programs, frequently relapsed for such reasons as finding herself "in a depressed mood," or "because the temptation was there." Her longest period of sobriety occurred in 1991 and lasted approximately two years. Moreover, she admitted using cocaine during her pregnancy, in March and May of 1995.

During the summer of 1995, the mother was involved in treatment at Bay Cove Treatment Center (Bay Cove), but was irregular in her attendance and tested positive for cocaine in July and August. Although placements were arranged for her in two inpatient drug treatment programs during the month of August, 1995, she did not attend either. On August 28, she arrived at Bay Cove with Mario, smelling of alcohol. Both she and the baby were dirty. Around the same time, a warrant was issued for her arrest because she had violated her probation.[5]

On August 30, 1995, the department's social worker filed a care and protection proceeding on behalf of Mario, and received temporary custody pursuant to G. L. c. 119, § 24. At that time, Mario was placed in foster care. Prior to filing the care and protection petition, the social worker contacted the mother to inform her of the pendency of the action, and to request a meeting to arrange visitation. The mother declined to meet the social worker that day, and also missed an appointment scheduled for the following day. Moreover, when questioned regarding the availability of relatives who might be interested in caring for Mario, she lied, expressly stating that Mario's paternal grandmother would be unable to take him.[6]

After Mario was removed from his mother's custody on August 30, 1995, she did not contact the department or request visitation until late October, 1995.[7] On September 27, 1995, she was arrested and charged with assault and battery and robbery, and held at Nashua Street Jail. On October 6, 1995, she was convicted and sentenced to two and one-half years at South Bay

[5]The record is unclear regarding the nature of the underlying conviction.

[6]Mario's mother told the social worker that his paternal grandmother had recently had surgery and would, therefore, be unable to care for him. When contacted, however, the grandmother denied having surgery and expressed an interest in caring for Mario. She also suggested that Mario's mother was angry with her and accordingly, did not want her to care for him.

[7]When asked at trial why she did not attempt to initiate visitation sooner, Mario's mother replied, "See, [the department's social worker] told me to go with her to the office [the day the department took custody of Mario], but I was — I don't know; I didn't want to go."

House of Correction (South Bay). Despite numerous attempts by the department's social worker to contact the mother's case worker at South Bay, a visit between Mario and his mother could not be arranged until April, 1996.

The mother contends that the judge's findings were insufficient to establish her unfitness by clear and convincing evidence. See *Adoption of Eleanor*, 414 Mass. 795, 800 (1993); *Adoption of Stuart*, 39 Mass. App. Ct. 380, 381 (1995). We disagree. In considering whether to grant a petition to dispense with parental consent to adoption, a judge must "evaluate whether the [parent is] able to assume the duties and responsibilities required of a parent and whether dispensing with the need for parental consent will be in the best interests of the [child]." *Adoption of Mary*, 414 Mass. 705, 710 (1993). Moreover, "a parent's character, temperament, conduct and capacity to provide for the child in the same context with the child's particular needs, affections, and age" must also be considered. *Id.* at 711. *Adoption of Ramon*, 41 Mass. App. Ct. 709, 717 (1996).[8]

The mother admittedly ingested cocaine on at least two occasions during her pregnancy, resulting in her baby being born addicted to cocaine and requiring methadone treatment. See *Adoption of Katharine*, 42 Mass. App. Ct. 25, 28-29 (1997) (recognizing that the mother's ingestion of cocaine during

---

[8]General Laws c. 210, § 3, lists thirteen factors relevant to a determination of parental unfitness. The judge made negative findings regarding nine of these factors, including: whether the child has been abused or neglected as a result of the parent's acts or omissions and services were offered and refused or were unable to be utilized on a regular and consistent basis such that a substantial danger of abuse or neglect continues; whether there exists severe or repetitive conduct toward the child of a physically, emotionally or sexually abusive nature; whether the parent has failed to provide the child with proper care and there is a reasonable expectation that she will be unable to do so within a reasonable time; whether there has been a lack of effort by the parent to remedy conditions which create a risk of harm due to abuse or neglect; whether a condition which is likely to continue, such as alcohol or drug addiction, makes the parent unlikely to provide minimally acceptable care; whether custody has been with the department for at least six months and the parent has failed to maintain significant and meaningful contact with the child; whether the parent wilfully failed to visit the child; whether the child is younger than four years of age, custody has been with the department for at least six of the past twelve consecutive months, and the child cannot be returned to the parent; and whether, because of the parent's absence, the child has formed a strong, positive bond with a substitute caretaker. G. L. c. 210, § 3.

pregnancy might be characterized as "an act of abuse," but declining to decide the issue). She continued to use cocaine during the first months of Mario's life, declined to participate in any of the drug rehabilitation services offered by the department, and appeared at Bay Cove unclean, smelling of alcohol and carrying Mario, who was also dirty. She refused to cooperate with the visiting nurse who had been assigned to assist with Mario's care despite his special medical needs, compromising his medical care and placing him at risk. Cf. *Adoption of Ramon*, 41 Mass. App. Ct. at 717 (denial of proper medical treatment considered in evaluating unfitness). Moreover, the conditions in which she and Mario lived were less than minimally acceptable.

The mother also violated her probation within four months of Mario's birth, and, as a result, was incarcerated. Cf. *Petition of Boston Children's Servs. Assn. to Dispense with Consent to Adoption*, 20 Mass. App. Ct. 566, 573 (1985); *Adoption of Nicole*, 40 Mass. App. Ct. 259, 261 (1996) ("compelled absence . . . by reason of incarceration [does not conclusively render a parent unfit, but may be] taken into account" in determining parental unfitness). Subsequently, she lied to the department's social worker regarding the availability of relatives to care for Mario, necessitating his placement in foster care, and thereafter failed to visit him, neglecting even to contact the department for over two months.[9]

In addition, nothing in the record suggests that the mother was likely to address her drug problem in the near future, or that her ability to parent Mario would improve. Indeed, over the course of thirteen years, she engaged in a pattern of drug abuse followed by inconsistent participation in rehabilitation services, and relapse. She repeatedly failed to utilize drug rehabilitation services offered by the department after Mario's birth, including at least two inpatient placements during the month of August, 1995, alone.

At the time of trial, the mother was incarcerated and not due to be released from prison for another year. She did not suggest that she would be prepared to care for Mario upon her release from prison, instead expressing her hope that Mario's paternal

---

[9]We realize that the mother's attempts to arrange visitation while she was in prison may have been frustrated by the department's inability to contact her case worker. We note, however, that nearly a month passed between Mario's removal from his mother's custody, and her incarceration.

grandmother would adopt him. Moreover, as a result of his mother's actions, Mario remained in foster care, had been with the same foster family for eight months, and had developed a strong, positive bond with the family. Cf. *Adoption of Nicole*, 40 Mass. App. Ct. at 262-263 (bond between child and foster or adoptive parents is a factor in determining unfitness).

This is not a case, as the mother suggests, in which the sole ground for terminating the mother's parental rights was her drug use. Contrast *Adoption of Katharine*, 42 Mass. App. Ct. 25. In *Adoption of Katharine*, we held that "a cocaine habit, without more, [does not] translate[] automatically into legal unfitness to act as a parent." *Id.* at 34. We also emphasized, however, that neither "the record [nor] the judge's findings [in that case] reflect[ed] a history of negligent or abusive care" by the parents. *Id.* at 26.

Here, the record solidly supports the judge's conclusion that the mother continually placed her son at risk and engaged in a pattern of neglect, due in part to her drug abuse and resulting instability, including compromising his medical care, failing to provide him with adequate living arrangements, violating her own probation and, therefore, subjecting herself to incarceration while Mario was in her care, consistently refusing to follow through with treatment for her own drug problem, and, finally, failing to maintain a relationship with him after he was placed in foster care. Moreover, the mother's continued refusal to participate in intensive, long-term drug treatment made it unlikely that she would address her problem in the near future or that her parenting abilities would improve, and placed Mario at risk of further neglect if returned to her custody. See *Custody of a Minor (No. 1)*, 377 Mass. 876, 883 (1979); *Adoption of Diane*, 400 Mass. 196, 204 (1987). We conclude, therefore, that the judge's determination of unfitness was supported by clear and convincing evidence.[10]

The mother contends that the judge's reliance on a past pat-

---

[10]Mario's mother emphasizes the fact that Mario appears to be free of significant "delays or medical issues," and seems to suggest that accordingly, she cannot have been unfit. It is well-established, however, that "the State's interest in protecting children from suffering harm at the hands of their parents may properly be preventive as well as remedial." *Custody of a Minor (No. 2)*, 378 Mass. 712, 714 (1979). Accordingly, "neither agencies responsible for the welfare of children nor judges sitting on these sorts of custodial questions need to wait for inevitable disaster to happen." *Adoption of Katharine*, 42 Mass. App. Ct. at 33.

tern of neglect, rather than on evidence of current fitness in support of his conclusion, mandates a different result. Specifically, she argues that the judge's "focus should have been on her conduct [while] in prison, [including participation in several self improvement courses,] and [on] evidence [contained in the court investigator's updated report] that she cared for her child appropriately."[11]

With respect to the judge's failure to consider the mother's participation in courses such as creative writing, business skills, and women's health issues, we discern no error. First, "an assessment of prognostic evidence derived from an ongoing pattern of parental neglect or misconduct is appropriate in the determination of future fitness and the likelihood of harm to the child[]." *Custody of a Minor (No. 1)*, 377 Mass. at 883. Thus, the judge could properly rely on the mother's prior patterns of neglect and misconduct in determining her current unfitness. *Adoption of Diane*, 400 Mass. at 204. Moreover, nothing in the record indicates that as a result of her participation in the courses, the mother 'had, indeed, "achieved . . . essential gains in her parenting skills." *Adoption of Paula*, 420 Mass. 716, 731 (1995). Contrast *Adoption of Stuart, supra* at 391-392 (judge failed to consider mother's participation in extensive therapy and training in parenting skills, and the fact that she discontinued her relationship with the male companion who allegedly abused the children).

We similarly find no error in the judge's failure to adopt the positive characterization of the mother's behavior contained in the investigator's updated report. A trial "judge's assessment of the weight of the evidence and the credibility of the witnesses is entitled to deference." *Custody of Eleanor*, 414 Mass. at 799. See also *Care and Protection of Three Minors*, 392 Mass. 704, 711 (1984). Thus, the judge was not required to afford any particular weight to the investigator's report simply because it was recently submitted.

*Adequacy of the department's efforts to hold the family together.*

The mother's argument that the department failed in its statutory duty to strengthen and encourage her family is also without

---

[11]The mother also challenges the judge's failure to credit "evidence from her Bay Cove counselor that she provided appropriate care [for] her child." The record, however, reveals only that the counselor reportedly told the court investigator that, to her knowledge, Mario's mother had not kept him out all night and that she had not seen him dirty.

merit. The department was obligated to use reasonable efforts to preserve the biological ties between mother and child. See *Adoption of Abigail*, 23 Mass. App. Ct. 191, 197 (1986); G. L. c. 119, § 1; 110 Code Mass. Regs. § 1.01 (1993). Its duty, however, was contingent upon the mother's fulfillment of her own parental responsibilities. 110 Code Mass. Regs. § 1.02 (1993). Each of the department's attempts to strengthen Mario's family was frustrated by the mother's own behavior, which evidenced her blatant disregard of those responsibilities. See 110 Code Mass. Regs. §§ 1.02(5) (to maintain meaningful contact with the child); 1.02(6) (to seek and utilize appropriate services); and 1.02(8) (to maintain contact with the department). In these circumstances, we think the department complied with its statutory and regulatory burden to strengthen the family, subject to its duty to insure that the child is protected from the absence, inability, inadequacy or destructive behavior of the parent. See G. L. c. 119, § 1.

Although the judge entered his findings of fact, ruling of law and order on June 15, 1996, it does not appear from the docket that a final decree was ever entered. A decree shall enter terminating the parents' rights to consent to the adoption of the child, and as so entered, is affirmed.

*So ordered.*