NOTICE: Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale. Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent. See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

22-P-254

ADOPTION OF AGATHA.[1]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The mother appeals from a decree of the Juvenile Court finding her unfit to parent her daughter, Agatha, terminating her parental rights as to Agatha, and approving the adoption plan proposed by the Department of Children and Families (DCF).[2] The mother also appeals from the trial judge's order for posttermination and postadoption visitation, arguing that the judge abused his discretion in ordering only two virtual visits per year.[3] We affirm.

Background. Agatha was born in January 2015. DCF first became involved with this family at that time because Agatha

---

[1] A pseudonym.

[2] The Juvenile Court judge also determined that the mother is unfit to parent her older child, Ben (a pseudonym). Both the mother's and Ben's appeals regarding Ben have been dismissed as moot because Ben attained the age of majority in November 2022, while this appeal was pending.

[3] The father, who neither appeared at trial nor appealed from the termination of his parental rights, is not a party to this appeal.

tested positive at birth for marijuana and Oxycodone and required treatment with morphine for withdrawal symptoms.

The mother and father, who had been in a relationship for approximately twenty years until their separation in March of 2021, have lengthy substance abuse histories. The mother started using alcohol and marijuana in her teenage years, self-medicated with Percocet following her mother's death in 2006, and thereafter escalated to using heroin, cocaine, and fentanyl. The mother began medication assisted treatment with Suboxone in 2007, switched to methadone treatment in 2008, and has engaged in methadone maintenance since. Her longest period of self-reported sobriety was two and one-half years leading up to her January 2020 relapse, which the judge did not credit due to her positive drug screens for fentanyl in June of 2019.

On April 2, 2020, a G. L. c. 119, § 51A, report (51A report) was filed alleging neglect of then fifteen year old Ben (see note 2, supra), and five year old Agatha by the mother and father stemming from the parents' substance abuse and lack of compliance with treatment. The judge found that during the ensuing G. L. c. 119, § 51B, investigation, the mother "made several promises to engage in treatment but failed consistently to do so, [she] continued to actively use substances, and [she] minimized the severity of [her] ongoing substance abuse."

2

DCF filed the instant care and protection petition on April 21, 2020, and obtained emergency custody of Ben and Agatha. The children were initially placed with the paternal grandmother until October 2020.[4] During that time, each of the mother's ten drug screens were positive for cocaine or a combination of cocaine and fentanyl, and she participated in only five of the eighteen visits DCF offered with the children. The mother produced her first clean drug screen and began an intensive outpatient program in November of 2020, following the children's removal from their paternal grandmother's home and placement in foster care. The mother's period of sobriety was temporary, however, as she relapsed in February of 2021 with all six drug screens from February 25, 2021, through August 11, 2021, testing positive for cocaine, fentanyl, or both. Despite the mother's statement in October of 2020, that she would end her relationship with the father if he continued to use substances, the two did not separate until March of 2021. While the mother's visitation attendance had been more consistent during her period of sobriety, she attended six, and was late to five, of the eleven offered visits between April and early July of 2021.

---

[4] The children were removed in October 2020, after a 51A report was filed alleging neglect by the paternal grandmother and her live-in partner for, among other things, excessive alcohol consumption in the home.

3

On September 21, 2021, trial was held during which the mother, the ongoing social worker, the adoption social worker, and Ben testified, and nineteen exhibits were admitted in evidence. On November 8, 2021, the judge found the mother unfit[5] to parent Agatha, terminated the mother's parental rights, dispensed with the need for parental consent to adoption, and approved DCF's proposed adoption plan for Agatha to be placed with a great-aunt in California pending an approved Interstate Compact on the Placement of Children (ICPC).[6] The judge also ordered two virtual posttermination and postadoption visits between Agatha and the mother each year.[7] The mother appealed. See note 2, supra.

Discussion. 1. Termination of parental rights. "To terminate parental rights to a child and to dispense with parental consent to adoption, a judge must find by clear and convincing evidence, based on subsidiary findings proved by at least a fair preponderance of evidence, that the parent is unfit

_____

[5] We note that "[d]espite the moral overtones of the statutory term 'unfit,' the judge's decision was not a moral judgment or a determination that the mother . . . [does] not love the child" (citation omitted). Adoption of Bea, 97 Mass. App. Ct. 416, 417 n.2 (2020).

[6] At the time of trial, Agatha had participated in one in-person visit and ten virtual visits with her great-aunt. One further interview was required before California approved or denied the ICPC.

[7] The judge initially did not include an order of posttermination and postadoption contact in his November 8, 2021 decision, but did so in his subsequent findings of fact and rulings of law.

4

to care for the child and that termination is in the child's best interests" (citation omitted). Adoption of Yalena, 100 Mass. App. Ct. 542, 549 (2021). "Parental unfitness is determined by considering a parent's character, temperament, conduct, and capacity to provide for the child's particular needs, affections, and age." Care & Protection of Vick, 89 Mass. App. Ct. 704, 706 (2016). "We give substantial deference to a judge's decision that termination of a parent's rights is in the best interest of the child, and reverse only where the findings of fact are clearly erroneous or where there is a clear error of law or abuse of discretion." Adoption of Ilona, 459 Mass. 53, 59 (2011).

The mother contends that some portions of the judge's findings[8] were erroneous and that absent those findings, DCF did not meet its burden to prove parental unfitness by clear and convincing evidence.[9] We disagree. Even assuming the challenged

---

[8] Specifically, the mother argues that the record did not support the judge's findings that (1) she "failed to produce any [urine] screens from May 28, 2021 through July 13, 2021, roughly a three-month period," (2) she chose not to visit with the children from April 2020 through June 2020, and (3) the social worker "observed an appropriate relationship between Mother and the children." The mother also argues that the judge's conclusion of law that "[t]he parents' actions as a couple are troublesome" is unsupported by the record to the extent the judge determined that the mother and father continued to "act as a couple" at the time of trial.

[9] The parties dispute whether the mother conceded parental unfitness based on her trial testimony and her counsel's statements during closing argument. When asked whether she was

portions of the judge's findings were error,[10] the record

supports the judge's critical findings and "the judge's over-all

conclusion of parental unfitness is fully supported by the

record." Adoption of Helen, 429 Mass. 856, 859-860 (1999).

The judge's extensive findings support his conclusion that

the mother was unfit to parent Agatha. The record amply

supports the judge's findings that, inter alia: the mother

exposed Agatha to drugs during pregnancy; the mother used drugs

---

"here today to get custody back" of her children, the mother
testified: "Maybe not get custody back, but I'm not ready to
just give all rights up." Furthermore, the mother's counsel
argued in closing that the mother "objects to [Agatha] being
adopted," but was "looking for either the paternal grandmother
to be reconsidered, and in the interim, having . . . permanent
custody maybe to the [DCF]." Even assuming the mother did not
waive or concede parental unfitness, we discern no clear error
in the judge's finding, which is supported by clear and
convincing evidence, that the mother is unfit for the reasons
discussed infra.

[10] To the extent the judge found that DCF offered the mother
opportunities to visit the children from April 2020 through June
2020 that she declined, we will assume arguendo that the finding
was clearly erroneous where the record reflects that DCF began
offering virtual visitation on June 24, 2020, and in-person
visits in July 2020. With respect to the other challenged
findings, the judge repeatedly acknowledged that the mother and
father are no longer in a relationship and concluded that the
mother had a loving relationship with Agatha. Furthermore, the
record supports that the ongoing social worker observed an
"appropriate" relationship between the mother and Agatha, and
that the mother did not provide urine screens between May 28,
2021, and August 11, 2021. Even assuming all of the challenged
findings were erroneous, however, the judge's determination of
parental unfitness is supported by clear and convincing
evidence.

6

while caring for her children;[11] the mother failed to separate from the father, who was actively using drugs, until March of 2021; the mother's substance abuse has continued throughout the pendency of this case aside from a period between November of 2020 and February of 2021;[12] the mother has refused to engage in inpatient treatment despite repeated promises to do so; the mother has not benefited meaningfully from her inconsistent participation in services; the mother "continually placed her own interests above those of her children"; the mother's substance abuse has caused her to "neglect [Ben]'s and [Agatha]'s need for adequate supervision appropriate to their ages, their need for a stable home life with proper routine and structure, the children's dental care, and [Ben]'s attendance and success at school"; and despite not being employed, the mother failed to regularly confirm and attend visits with her children and did not visit them for two months prior to trial. See Adoption of Luc, 484 Mass. 139, 144-146 (2020) (clear and convincing evidence of unfitness based in part on mother's

_____

[11] Although the mother claimed that she used drugs when the children stayed overnight at the paternal grandmother's house, the paternal grandmother stated that the children never stayed at her home overnight.  Accordingly, the judge did not err in not crediting the mother's claim.
[12] The mother tested positive for cocaine, fentanyl, or both in seventeen out of twenty-three drug screens from April of 2020 through August of 2021, and admitted to using drugs one week before the trial.

substance abuse, noncompliance with services, and neglect of older children); Adoption of Mario, 43 Mass. App. Ct. 767, 770-771 (1997).  The judge's findings are specific, detailed, and demonstrate close attention to the evidence.  See Adoption of Anton, 72 Mass. App. Ct. 667, 673 (2008).  Furthermore, the judge considered the required factors set forth in G. L. c. 210, § 3 (c), and found factors (ii), (iii), (iv), (vi), (viii), (ix), (x), and (xii) applicable.  We discern no clear error in the judge's determination, supported by clear and convincing evidence, that the mother is unfit to parent Agatha.

We reject the mother's contention that there was insufficient evidence of a nexus between her substance abuse and her inability to care for Agatha.  See Adoption of Katharine, 42 Mass. App. Ct. 25, 34 (1997) ("a cocaine habit, without more, [does not] translate[] automatically into legal unfitness to act as a parent").  As the judge acknowledged, the mother's "longstanding substance abuse history endangered [Agatha] even before she was born," with Agatha requiring hospitalization and morphine treatment for withdrawal symptoms for three weeks after her birth.  The record supports "that the mother continually placed [Agatha] at risk and engaged in a pattern of neglect, due in part to her drug abuse and resulting instability." Adoption of Mario, 43 Mass. App. Ct. at 772.

The mother further maintains that even if DCF met its burden of proving parental unfitness, the judge abused his discretion in terminating her parental rights. We disagree. Contrary to this assertion, the judge did not err or abuse his discretion in terminating the mother's parental rights before the ICPC was approved. See Adoption of Jacques, 82 Mass. App. Ct. 601, 610 (2012) ("the absence of imminent adoption prospects does not, by itself, invalidate a decision to terminate parental rights"). "[N]othing in the record suggests that the mother was likely to address her drug problem in the near future, or that her ability to parent [Agatha] would improve." Adoption of Mario, 43 Mass. App. Ct. at 771. "In these circumstances, where the [mother] has had ample opportunity to achieve fitness as a parent but has failed to follow through, it is only fair to the child[] to say, at some point, 'enough.'" Adoption of Nancy, 443 Mass. 512, 517 (2005).

2. Posttermination and postadoption visitation. We are likewise unpersuaded by the mother's argument that the judge abused his discretion in ordering only two virtual posttermination and postadoption visits between the mother and Agatha each year.[13]

---

[13] The mother did not argue that posttermination and postadoption visitation was in Agatha's best interests, nor did she request such visitation, during trial. See Adoption of Mary, 414 Mass. 705, 712 (1993); Adoption of Gillian, 63 Mass. App. Ct. 398, 408

9

After parental rights are terminated, it is within the judge's broad discretion to order posttermination and postadoption visitation between the parent and child. See Adoption of Douglas, 473 Mass. 1024, 1027 (2016). A two-part inquiry informs a judge's decision to order visitation: "First, is visitation in the child's best interest? Second, in cases where a family is ready to adopt the child, is an order of visitation necessary to protect the child's best interest, or may decisions regarding visitation be left to the judgment of the adoptive family?" Adoption of Ilona, 459 Mass. at 63. To determine whether visitation is in the child's best interests, a judge should consider "whether there is 'a significant existing bond with the biological parent' whose rights have been terminated." Id. at 63-64, quoting Adoption of Vito, 431 Mass. 550, 563 (2000).

Here, the judge determined that posttermination and postadoption visitation between Agatha and the mother was in Agatha's best interests based on their loving relationship despite the mother's inconsistency in confirming and attending visits.[14] Acknowledging that "no evidence was presented

_____

(2005) (issue of visitation waived where parents did not raise it at trial). Even assuming the issue is not waived, we discern no abuse of discretion in the judge's order for posttermination and postadoption visitation for the reasons discussed infra.

[14] By contrast, the judge determined that visitation with the father was not in Agatha's best interests where he demonstrated

10

regarding the adoptive resource's willingness to facilitate visitation," the judge determined that an order was necessary to safeguard Agatha's best interests.  See Adoption of Rico, 453 Mass. 749, 757 (2009).  The judge properly sought to "balance the benefit to the child of an order of visitation that will provide assurance that the child will be able to maintain contact with [the mother], with the intrusion that an order imposes on the rights of the adoptive parents."  Adoption of Ilona, 459 Mass. at 64.  On the record before us, we cannot say that the judge's decision to order two annual virtual visits was "a clear error of judgment in weighing the factors relevant to the decision such that the decision falls outside the range of reasonable alternatives" (quotation and citation omitted).  L.L. v. Commonwealth, 470 Mass. 169, 185 n.27 (2014).

Decree affirmed.

By the Court (Neyman, Grant & Hershfang, JJ.[15]),

*Joseph F. Stanton*

Clerk

Entered:  June 6, 2023.

---

no "willingness or ability to be a present force in [Agatha]'s life."

[15] The panelists are listed in order of seniority.