NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

24-P-1320

ADOPTION OF BELLA (and a companion case[1]).

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

Following a trial on a review and redetermination motion brought by the Department of Children and Families (department), a judge of the Juvenile Court entered decrees terminating the mother's parental rights to her two children, Bella and Onyx.[2] On appeal, the mother argues that the evidence did not clearly and convincingly establish that she is currently unfit or that she would remain unfit to parent her children in the future. She further contends that the judge erred in concluding that the department made reasonable efforts to reunite her with Bella and Onyx.  We affirm.

---

[1] Adoption of Onyx.  The children's names are pseudonyms.

[2] The father did not appear for trial.  His parental rights also were terminated; however, he has not appealed.

Background.  On December 6, 2021, when Bella was eight years old and Onyx was five years old, the department sought and was awarded emergency temporary custody of both children.  One year later, on December 7, 2022, the mother and the father stipulated to their unfitness and the judge entered orders granting the department permanent custody of both children.  Thereafter, on August 28, 2023, the department filed a motion pursuant to G. L. c. 119, § 26, seeking review and redetermination of the permanent custody order along with termination of each parent's rights to each child.  That motion was allowed, and a trial took place over four nonconsecutive days between June and July 2024.  At the conclusion of the trial, the judge issued comprehensive findings of fact and conclusions of law, which we summarize as follows.

The mother and the father were married in 2010.  Bella was born two years later in 2012, and Onyx was born in September 2016.  The department first became involved with the family when Onyx was born premature and substance exposed.  Onyx had to be resuscitated at delivery and tested positive for Subutex, codeine, and morphine.  The department investigated and the mother and the father disclosed that they had been using Percocet together for the past two to three years.  The mother also reported that she and the father had enrolled in substance use treatment programs, but the department could not

2

independently verify this claim. Ultimately, the mother and the father rejected the department's recommended services and refused to sign any releases. Because the parents would not cooperate with the department, the case was closed in July of 2017. Thereafter, the mother and the father continued to use opiates, heroin, fentanyl, and "crack" cocaine.

The department became involved with the family again in December of 2021, when the mother brought Onyx to the hospital for a tonsillectomy and appeared to be under the influence of drugs.[3] Hospital staff discovered Onyx's teeth were rotten and, shortly thereafter, the department learned that Bella had an "atrocious" school attendance record and went to school dirty and improperly dressed for the weather. The department filed a petition alleging that Bella and Onyx needed care and protection and obtained emergency custody of both children.[4]

The department then developed an action plan for the mother which, among other things, required her to complete mental health and substance use treatment plans, meet with the

---

[3] The mother admitted during her testimony at the trial that she had used heroin at the hospital.

[4] The department placed Bella and Onyx with their paternal aunt, but she became overwhelmed with the responsibility and gave up the placement. The department then transferred Bella and Onyx to a foster home in January of 2022, where they stayed until they were placed with their preadoptive parents in July of 2023.

department, and remain sober. In the following week, the mother briefly entered two treatment facilities without undergoing any significant treatment. While the mother reported to the department and testified that she attended weekly alcoholic's and narcotic's anonymous meetings ("AA" and "NA"), there was no evidence to support this assertion.

Within a month of the removal of the children from their parents, in January of 2022, the mother overdosed on fentanyl. After the mother was treated and released from the hospital, she and the father sought treatment at an outpatient facility. During intake, the mother reported that her longest period of sobriety was "none."[5] The mother tested positive for cocaine and fentanyl when she entered the program and continued to test positive for cocaine, fentanyl, and marijuana. During this time, the mother also appeared to be under the influence during several visits with Bella and Onyx.[6] Despite the department's

---

[5] The father also has a history of substance use disorder. He was arrested twice for driving under the influence of narcotics, and once for possession of crack cocaine and fentanyl, respectively. When checking into the outpatient facility, the father reported using heroin and fentanyl and treating his substance use disorder with Suboxone obtained from "the street."

[6] The father has also appeared under the influence at multiple visits with Bella and Onyx, and when approached by the department about changing outpatient programs and attending extended parenting classes, the father said he did not feel like he needed them.

attempts to refer the mother to other programs, the mother was not amenable to those efforts until May 2022, at which time she began working with an in-home substance use counselor and created a relapse plan.  Ultimately, however, this arrangement did not have a successful outcome.  The mother continued to test positive for cocaine and fentanyl throughout the summer, and she no longer permitted the department to make home visits.

Despite experiencing unabating symptoms of substance use disorder, the mother obtained employment in September 2022, and began working as a retail store merchandise manager.  Around this time, she told the department that she had started treatment at a second outpatient treatment center, but the department was unable to confirm the mother's attendance.  In addition, the mother began canceling her visits with Bella and Onyx and stopped providing toxicology screen results to the department.[7]  On December 5, 2022, the department changed Bella's and Onyx's goals to adoption, and two days later, a custody hearing was held.  As previously noted, both parents stipulated to their unfitness and the judge entered orders awarding permanent custody of Bella and Onyx to the department.

---

[7] Before the mother stopped providing toxicology screen results altogether, the department had become concerned that the mother was not submitting her own urine for testing.

Following the custody hearing, the mother had little contact with the department. She missed five visits with Bella and Onyx between January and April 2023 and, at one visit in March, was asked to leave because she appeared to be under the influence of drugs.[8] In April, the department changed the visitation schedule from weekly to biweekly. The mother did not contest this change. In June, the mother reported that she had sought treatment at different intensive outpatient programs, but they denied her placement due to her private insurance. The department was unable to identify the names of those programs.

Meanwhile, in July of 2023, the children were placed together in their preadoptive home, where they were living at the time of trial. The mother did not visit Bella or Onyx for three months after that placement. Both children have special needs, which their preadoptive parents have addressed with the assistance of counsellors and specialists.[9]

The mother's circumstances began to improve by the beginning of 2024 and up to the time of the trial on the review

---

[8] The father likewise was inconsistent with visits between January and March and thereafter stopped attending visits and communicating with the department entirely.

[9] Both children currently participate in individual therapy and engage in family therapy with their preadoptive parents. When the children were removed from the mother's custody, both were obese, but Onyx has since shown significant improvement maintaining a healthy weight.

and redetermination motion.  The mother began to re-engage with Bella and Onyx.  She continued to work at the retail store and, by the time of trial, had been promoted to the position of store manager.  In addition, the mother enrolled at an intensive outpatient program.  At that program, the mother had eight unsupervised toxicology screenings, all of which came back negative for substances.  In April 2024, the department conducted a home visit and found nothing of concern.  However, despite these positive gains, the mother missed fifty-six group sessions at the outpatient program between February and June.  The mother testified that she missed these sessions due to illness or scheduling conflicts, but the judge did not credit this testimony.

As we have previously noted, the judge concluded that termination of the mother's parental rights was in the children's best interests.  She found that the mother had not sufficiently engaged in substance use treatment or therapy and was not forthcoming about her relationship with the father; as a result, she was not able to parent her children.[10]  The judge further concluded that the mother would continue to be unfit,

_____

[10] The mother reported that the father was in an inpatient program and not living in the home, but at trial, the paternal grandfather testified that the mother and the father were still in a relationship and living together.

7

and also approved of the department's plans for the children of adoption by their preadoptive parents.

Discussion. 1. The mother's parental unfitness. The mother first argues that the judge erred in concluding she was unfit because by the time of trial, she had engaged in an intensive outpatient treatment program, was sober, and was employed.

"When reviewing a decision to terminate parental rights, we must determine whether the trial judge abused [her] discretion or committed a clear error of law." Adoption of Elena, 446 Mass. 24, 30 (2006). "[Her] assessment of the weight of the evidence and the credibility of the witnesses is entitled to deference" (citation omitted). Adoption of Quentin, 424 Mass. 882, 886 (1997). Although, as the judge noted, the mother had indeed made progress, the judge did not abuse her discretion in concluding that the mother's attempts to treat her substance use disorder were not meaningful and that, as a result, her substance use issues were not adequately addressed. "In a review and redetermination proceeding, 'the judge does not start with a blank slate'" (citation omitted). Adoption of Darlene, 99 Mass. App. Ct. 696, 703 (2021). It was undisputed that the mother's history of addiction spanned twenty years and that she had only recently experienced a few short periods of sobriety. The judge properly considered evidence that established the

8

mother consistently presented under the influence of, and tested positive for, illegal substances, often skipped visits with her children, and at times resisted services and assistance offered to her by the department. Essentially, the mother's argument "amount[s] to no more than a disagreement with the judge's weighing of the evidence," something firmly within the judge's discretion and, absent a showing far more serious than the present one, outside of ours. Adoption of Don, 435 Mass. 158, 166 (2001).

The mother also argues that the judge's finding that she failed to "demonstrate[] her sobriety" shows that the judge improperly shifted the burden to her to prove her fitness. We are not persuaded. The judge applied all the factors required by G. L. c. 210, § 3, and specifically acknowledged that the mother "does not bear the burden of proving her fitness." There was no error. See Adoption of Terrence, 57 Mass. App. Ct. 832, 836 (2003).

2. The judge's finding that the mother's unfitness was not temporary. Next, the mother argues that even if the judge did not err in concluding that the mother was unfit, she still erred by concluding that the mother would continue to be unfit in the future. Again, "[w]e review the judge's findings with substantial deference, recognizing her discretion to evaluate a witness's credibility and to weigh the evidence," Adoption of

9

Nancy, 443 Mass. 512, 515 (2005), "and reverse only where the findings of fact are clearly erroneous or where there is a clear error of law or abuse of discretion." Adoption of Ilona, 459 Mass. 53, 59 (2011).

"Because childhood is fleeting, a parent's unfitness is not temporary if it is reasonably likely to continue for a prolonged or indeterminate period." Adoption of Ilona, 459 Mass. at 59. The judge found that a year after the mother stipulated to her unfitness, she enrolled at an intensive outpatient treatment program where she was unable to consistently attend group sessions. While it is true that the mother's toxicology screening test results indicated no drug use, the judge was within her discretion to discredit those results as the tests were unsupervised, and other evidence contradicted the mother's testimony regarding her sobriety. The judge also found the mother's ongoing relationship with the father indicative of her continued unfitness. In addition, the mother has not taken any parenting courses and, as discussed above, both children have needs requiring specialized care, which the preadoptive parents have been coordinating and providing.

3. <u>The department's reasonable efforts to reunite the family</u>. Lastly, the mother claims that the department failed to make reasonable efforts to reunify her with her children.

10

Because this issue was not raised in a timely manner, it is waived.[11]  However, even if preserved, the claim lacks merit.

"A judge's determination that the department made reasonable efforts will not be reversed unless clearly erroneous."  Adoption of West, 97 Mass. App. Ct. 238, 242 (2020), citing Adoption of Ilona, 459 Mass. at 61-62.  Such is not the case here.  The mother claims that the department failed for two reasons.  First, she contends that the department failed to update her action plan for two years; and second, the department failed to schedule and conduct a home visit with her for a period of six months, from November of 2023 to April of 2024.  While the record contains support for both allegations, the judge's finding that the department made reasonable efforts is based on additional compelling evidence.  The department repeatedly referred the mother to substance use counseling services, parenting classes, and made efforts to accommodate her needs when scheduling visits.  The mother did not always take advantage of these opportunities, failed to maintain contact with the department, and refused home visits.  See Adoption of Mario, 43 Mass. App. Ct. 767, 774 (1997) (department's duty "to use reasonable efforts . . . was contingent upon the mother's

_____

[11] There is no indication in the record that the mother raised this issue before trial.

11

fulfillment of her own parental responsibilities").  There was no error.

Decrees affirmed.

By the Court (Vuono,
  Desmond & Toone, JJ.[12]),

Clerk

Entered:  December 17, 2025.

---

[12] The panelists are listed in order of seniority.