NOTICE: Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale. Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent. See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

25-P-803

ADOPTION OF KOLLEEN.[1]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

This appeal involves the welfare of Kolleen (the child) and her mother's capacity to care for her. After a trial, a Juvenile Court judge found the mother unfit to care for the child and terminated her parental rights. On appeal, the mother challenges the judge's ultimate determination, as well as certain findings of fact and the decision not to order post-termination visitation.[2] We affirm.

---

[1] The child's name is a pseudonym.

[2] Although the mother has also claimed that the Juvenile Court lacked subject matter jurisdiction, she has since waived that claim, and we conclude that the operative petition satisfied the statutory requirements to establish jurisdiction. See Care & Protection of Lillian, 445 Mass. 333, 340 (2005); G. L. c. 119, § 24.

Background.  The child was born in 2013.[3]  The child was hospitalized at birth and given morphine to treat withdrawal symptoms, having been exposed to amphetamines, methamphetamines, and Suboxone during the mother's pregnancy.

While raising the child, the mother continued to suffer from drug and alcohol misuse, and she has been diagnosed with opioid use disorder, alcohol use disorder, attention deficit hyperactivity disorder (ADHD), depression, and oppositional defiant disorder (ODD).  While she sought treatment for her drug use between November 2019 and June 2024, her participation in treatment was sporadic and ultimately unsuccessful.  During treatment, she was advised by her medical provider of the risk of her continued use of illicit stimulants, which included risk of "seizure," "cardiac complications," and "psychiatric emergencies."  She nevertheless persisted in misusing illicit stimulants.  And despite her diagnosis and documented alcohol misuse, the mother has denied her alcohol misuse and refused to seek treatment for it.  The mother has suffered multiple seizures related to alcohol withdrawal, one of which led to the child discovering the mother "in a pool of blood."

---

[3] The child's putative father is not listed on the child's birth certificate, did not establish paternity, and is not a party to this appeal or the underlying petition.

2

The mother also struggled to maintain stable and safe housing while raising the child.  Between 2018 and 2020, they resided in at least four different shelters, and prior to that, they resided with a man whom the mother knew to be a sex offender.  Additionally, the mother was arrested in May 2017 for child endangerment, and in August 2018 for assault.

The child's access to education was inconsistent.  The child was enrolled in kindergarten in 2019-2020 but did not enroll in first grade the following year.  The child was absent from school nineteen times in 2021-2022, and twenty-six times in 2022-2023.

The Department of Children and Families (DCF) opened a case for services in March 2023.  The mother refused to engage with DCF on multiple occasions during its investigation, and DCF was awarded temporary custody of the child in May 2023 and has since retained custody.  During that period, the child has entered foster care, has had consistent school attendance, has attended therapy, and has regularly visited with her adult sister.

For several months following the child's removal, the mother declined to engage in home visits or to schedule visits with the child.  The mother began supervised visitation with the child in December 2023.  Although the mother acted appropriately and appeared sober during some of those visits, she canceled others with minimal notice and justification, and at other times

3

acted erratically, including calling the child a "retard" and "moron."

Discussion.  We review the judge's findings "with substantial deference and will not disturb those findings unless clearly erroneous."  Adoption of Cadence, 81 Mass. App. Ct. 162, 166 (2012).  We also "defer to the judge's determinations regarding the best interests of the child, and reverse only where there is a clear error of law or abuse of discretion." Id.

1.  Termination of parental rights.  The mother argues that there was an insufficient nexus between her substance misuse and neglect of her child and that several of the judge's findings of fact concerning the mother's awareness of risks to her health caused by her substance misuse were unsupported at trial.  We conclude the judge's decision is more than sufficiently supported by the evidence.

First, we acknowledge that "evidence of alcohol or drug use is relevant to, but not dispositive of, a parent's willingness, competence, and availability to provide care" (quotation and citation omitted).  Adoption of Luc, 484 Mass. 139, 147 (2020). Although "parental rights should not be terminated only because the parent has a substance use disorder," a parent's "willingness to engage in treatment is an important consideration in an unfitness determination where the substance

4

dependence inhibits the parent's ability to provide minimally acceptable care of the child."  Id.

Here, however, the judge's decision to terminate the mother's parental rights was supported by clear and convincing evidence of neglect stemming from her long-term, unresolved substance misuse.  See Adoption of Mario, 43 Mass. App. Ct. 767, 772 (1997) (affirming termination of parental rights supported by mother's having "engaged in a pattern of neglect, due in part to her drug abuse and resulting instability").  The mother was diagnosed with opioid use disorder and alcohol use disorder, in addition to ADHD and ODD.  The mother's substance misuse spans the breadth of the child's life, the child having been exposed to methamphetamine in utero, necessitating the administration of morphine at birth.  Although the mother engaged in some treatment for opioid addiction, which was acknowledged by the judge, she was inconsistent, ceased treatment entirely four months before trial, and never admitted to her alcohol dependency or sought professional help in treating it or the associated withdrawal symptoms it caused.  These symptoms included seizures, during one of which the child discovered the mother "in a pool of blood."  Throughout these struggles, as we have noted, the mother could not maintain stable housing, and the child missed a significant amount of school.

5

The mother's persistent struggles with substance misuse caused "a pattern of neglect." Adoption of Mario, 43 Mass. App. Ct. at 772. Furthermore, the mother's unwillingness to consistently engage in opioid treatment and to treat or even acknowledge her diagnosed alcohol use disorder are "important consideration[s]" on which the judge properly relied to substantiate his unfitness decision.[4] Adoption of Luc, 484 Mass. at 147.

We also disagree with the mother's contentions that DCF failed to provide a "sufficiently detailed" adoption plan and that the judge's decision to adopt the proposed plan was not in the child's best interest. See Adoption of Varik, 95 Mass. App.

---

[4] Ten of the judge's findings of facts stating that the mother had been advised by medical providers to avoid using alcohol along with Adderall are unsupported by the record. However, the mother's medical records indicate that she was advised that "using illicit stimulants" created a risk of "seizure," "cardiac complications," and "psychiatric emergencies," and she persisted in using illicit stimulants even after being apprised of these risks. The record also indicates, and the mother acknowledged at trial, that she had been advised to reduce her alcohol intake due to her impaired liver function and the increased risk of respiratory depression when ingested concurrently with suboxone, along with the risk of acute intoxication. She persisted in consuming alcohol, nonetheless. Although the records do not indicate that the providers addressed the risks of alcohol and Adderall together, and so the judge's findings to that effect were in error, such error was harmless. The important point is that the mother was warned that her behavior could cause seizures, medical emergencies, and even death, but she engaged in that behavior nonetheless, and experienced seizures and medical emergencies. See Care & Protection of Frank, 409 Mass. 492, 499 (1991).

6

Ct. 762, 770-771 (2019).  Although DCF must present and the judge must consider a permanency plan, G. L. c. 210, § 3, that plan need not be "fully developed" at the time of trial, Adoption of Paula, 420 Mass. 716, 722 n.7 (1995), but rather need only provide enough information "that the judge may properly evaluate the suitability of [DCF]'s proposal." Adoption of Willow, 433 Mass. 636, 652-653 (2001).

The plan proposed by DCF in this case was adequate and, as such, supported the judge's decision that it was in the child's best interest "to end all legal relations between parent and child."  Adoption of Nancy, 443 Mass at 515.  The proposed plan described the child's current placement in a licensed foster home.  The foster parents wished to adopt the child and were preparing for permanent placement, the home was being evaluated to ensure that it contained adequate safety features and space for the child, the child had no special needs, and the child's medical and educational needs were being met.  That the plan also indicated that DCF had explored placement in the care of the child's adult sister and had attempted to aid the sister in securing stable housing supports the sufficiency of the plan's details.  Cf. Adoption of Varik, 95 Mass. App. Ct. at 771 (plan held inadequate where DCF had not pursued request to review suitability of kinship placement with aunt).  It is a strength, rather than a deficiency, in the plan that it is flexible enough

7

to allow a kinship placement if that becomes practical.  Under either scenario, the termination of the mother's parental rights will enable the child's guardian to care for the child without interference.  The plan's details, considered "in combination with the overwhelming evidence presented at trial concerning the mother's unfitness and the child[]'s best interests," supported the judge's decision to terminate the mother's parental rights. Adoption of Willow, 433 Mass. at 653.

2.  Post-termination visitation rights.  Lastly, we affirm the judge's decision not to order post-termination visitation rights.  This decision must be based on the best interests of the child, Adoption of Douglas, 473 Mass. 1024, 1027-1028 (2016).  Although we acknowledge the bond between the mother and the child, the existence of such a bond does not mean that continued visitation "would assist [the child] in her transition."  Adoption of Helga, 97 Mass. App. Ct. 521, 531 (202).  Rather, given the mother's history of missing visits after the child was removed from her care, lack of contact, and erratic and behavior, we do not find the judge's decision to be an abuse of discretion.  Adoption of Xarissa, 99 Mass. App. Ct. 610, 625 (2021) (reviewing post-termination visitation order

based on inconsistency and inappropriateness of post-removal visits).

Decree affirmed.

By the Court (Vuono, Ditkoff & D'Angelo, JJ.[5]),

*Paul Little*

Clerk

Entered:  March 3, 2026.

---

[5] The panelists are listed in order of seniority.

9