ADOPTION OF KATHARINE & another.[1]

No. 95-P-1765.

Worcester. October 22, 1996. - January 6, 1997.

Present: ARMSTRONG, PERRETTA, & KASS, JJ.

*Adoption,* Dispensing with parent's consent. *Parent and Child,* Adoption, Dispensing with parent's consent to adoption. *Evidence,* Child custody proceeding.

On the record of a proceeding to dispense with parental consent to the adoption of two children, the record, which demonstrated no abuse or neglect, and the judge's findings, which did not properly assess parental fitness in light of the parents' addiction to cocaine, were insufficient to support the judgment dispensing with such consent; the matter was remanded for further proceedings as to parental fitness and the best interests of each child. [25-35]

PETITION filed in the Westborough Division of the District Court Department on May 12, 1994.

The case was heard by *Paul S. Waickowski,* J.

*Carol A. Erskine* for the mother.

*Linda S. Fidnick* for the father.

*Christopher E. Lee* for the Department of Social Services.

*Nan Myerson Evans* for the minor children.

KASS, J. During two pregnancies, the mother ingested cocaine. Her first child, whom we call Katharine, was born prematurely on January 28, 1993, with cocaine in her system. Considerable efforts by social service agencies to assist the parents in abstaining from drugs — the father used cocaine as well — were not successful. Another child, whom we shall call Jeptha, was born on May 6, 1994, also with cocaine in his system.

The mother and father have appealed from a judgment

---

[1] Her younger brother, Jeptha. Both are fictitious names.

under G. L. c. 119, § 26(4), rendered April 28, 1995, by a judge of the District Court, that the children be placed for adoption without the consent of the biological parents. In summary, the judge found that the mother had displayed neither desire nor will to overcome her cocaine addiction, had failed to avail herself of programs through which she might have resisted drug use, had, indeed, avoided contact with the Department of Social Services (DSS) because she was still using cocaine, and that it was "clear the mother's need for drugs in the future is extremely likely to negatively impact on the rights of the children to a stable and safe environment." As to the father, the judge found that he had not only resisted a DSS service plan directed toward ending his use of cocaine but that the father did not "believe cocaine use a problem." We conclude that the record as developed does not support a judgment that dispenses with consent to adoption, but we are not prepared to say that either child belongs in the unsupervised care of the biological parents.

"It is clear," the trial judge observed, "that if the parents had to cho[o]se between future drug use and the well being of their children, the children would suffer. The rights of the children to a stable and safe environment are greatly at risk in this home. Court, after eight months of court observation of this matter, observes no improvement or any likelihood that current parent unfitness will ever be remedied."

There is a basis in the record for the judge's pessimism about the futures of the parents. Their lives, while under scrutiny of DSS and the court, were marked by a not uncommon complex of social dysfunction, including the father's meager intermittent employment, the repeated failure of both mother and father (perhaps rooted in inability) to keep appointments or arrange for drug screening tests, their substance abuse, and their acute poverty. What is singular about the case is that the record and the judge's findings do not reflect a history of negligent or abusive care of the daughter Katharine, the only child who has been in the parents' care. The observations about the couple's daughter Katharine (Jeptha was removed from their custody at birth) are almost entirely of a cheerful child whose parents have adequately fed and clothed her, provided for her medical care, supervised her, and loved her. Indeed, in February, 1994, at a time when Katharine had lived with her parents for a year and about ten

weeks before the birth of Jeptha, a DSS social worker who had conducted an unannounced inspection visit to the parents' home, made a report in which she described Katharine as "very alert . . . very happy and healthy . . . very neat." The social worker concluded that Katharine was not at risk of abuse or neglect by either parent and recommended that DSS close the case, and the case was closed; it was reopened when routine screening of the new baby for cocaine was positive.

This appeal poses the question, therefore, whether a trial judge may predict abuse and neglect on the basis of other pathology in the lives of the child's parents, notably, in this case, their use of cocaine and, on the basis of that prediction, make an order that separates children from their biological parents.

General Laws c. 119, § 26(4), directs the judge to decide in accordance with the standards of G. L. c. 210, § 3, whether the best interests of a child require dispensing with consent of the biological parents to adoption of the child by others. We look to the considerable case law that has developed under G. L. c. 210, § 3.

Removal of children irrevocably from their biological parents is an exceptionally far reaching exercise of State power. Cf. *Lassiter* v. *Department of Social Servs.*, 452 U.S. 18, 27 (1981); *M.L.B.* v. *S.L.J.*, 117 S. Ct. 555, 564-565 (1996); *Petition of the Dept. of Pub. Welfare to Dispense with Consent to Adoption*, 383 Mass. 573, 588-589 (1981); *Custody of Two Minors*, 396 Mass. 610, 617 (1986); *Petition of Boston Children's Serv. Assn. to Dispense with Consent to Adoption*, 20 Mass. App. Ct. 566, 566-567 (1985). In recognition of the constitutionally protected interest of parents in maintaining the natural bond with their children, a judge must find by clear and convincing evidence that a parent is currently unfit to further the child's best interest. *Santosky* v. *Kramer*, 455 U.S. 745, 769 (1982). *Adoption of Carlos*, 413 Mass. 339, 348-350 (1992). *Adoption of Stuart*, 39 Mass. App. Ct. 380, 381 (1995). Because the determination that must be made is one of constitutional dimension, the cases have emphasized the degree of specificity and adherence to statutory criteria that are required of findings which are sufficient to support the grave conclusion of unfitness. See *Custody of Two Minors*, 396 Mass. at 619; *Custody of Eleanor*, 414 Mass. 795, 799 (1993); *Adoption of Stuart*, supra at 381-382.

Parental unfitness, as developed in the case law, means more than ineptitude,[2] handicap,[3] character flaw,[4] conviction of a crime,[5] unusual life style,[6] or inability to do as good a job as the child's foster parent.[7] Rather, the idea of "parental unfitness" means "grievous shortcomings or handicaps" that put the child's welfare "much at hazard." *Petition of the New England Home for Little Wanderers to Dispense with Consent to Adoption,* 367 Mass. 631, 646 (1975). Endangerment of the child from abuse, neglect, or other activity harmful to the children must be in the picture. *Petition of the Dept. of Pub. Welfare to Dispense with Consent to Adoption,* 383 Mass. at 591-592. At the core of the inquiry is the question of what is in the best interests of the child, although the answer to that question in any given case is bound up with the determination of unfitness. The child's best interests may bear on how much parental deficiency is tolerable, or, conversely, the degree of parental deficiency may determine the child's best interests. *Petition of New England Home for Little Wanderers to Dispense with Consent to Adoption, supra* at 641 ("the tests are not separate and distinct but cognate and connected").

By the enactment of St. 1992, c. 303, § 5, the Legislature enumerated and to some degree modified, the factors that a court is to consider in assessing parental fitness. The 1992 act inserted in G. L. c. 210, § 3(c), a list of thirteen factors that a court shall consider (not to the exclusion of other relevant factors that it may consider). Of those thirteen factors, the first two are noteworthy in the case before us in terms of what does *not* pertain to these children. They have not been abandoned (factor [i]), and they have not been abused or neglected (factor [ii]). One might categorize the mother's involuntary transfer of cocaine into the bloodstream of her babies

---

[2]Cf. *Santosky* v. *Kramer,* 455 U.S. at 753; *Petition of the Dept. of Pub. Welfare to Dispense with Consent to Adoption,* 383 Mass. at 591-592.

[3]Mental retardation is not of itself a ground for terminating parental rights. *Adoption of Abigail,* 23 Mass. App. Ct. 191, 195 (1986).

[4]Or perhaps none of us would be a fit parent.

[5]*Petition of Boston Children's Serv. Assn. to Dispense with Consent to Adoption,* 20 Mass. App. Ct. at 573.

[6]*Petition of the Dept. of Pub. Welfare to Dispense with Consent to Adoption,* 383 Mass. at 591. *Custody of a Minor,* 389 Mass. 755, 767-768 (1983).

[7]*Care and Protection of Zelda,* 26 Mass. App. Ct. 869, 872 (1989).

during gestation as an act of abuse,[8] but even if so character-
ized (we do not so decide), the act is self limited in that it
cannot be repeated as to the child affected. Three of the listed
factors are of special pertinence.

The first of those three, subparagraph (v) of § 3(c) reads as
follows:

> "the child is younger than four years of age, a court of
> competent jurisdiction has transferred custody of the
> child from the child's parents to the department and
> custody has remained with the department for at least
> six of the last twelve consecutive months[,] and the child
> cannot be returned to the custody of his parents at the
> end of such twelve month period; provided, however,
> *that the parents were offered or received services intended
> to correct the circumstance and refused or were unable to
> utilize such services on a regular or consistent basis.*"
> (Emphasis supplied.)

Katharine and Jeptha are younger than four years of age and,
as of the time the District Court judge made his findings, had
remained in the custody of DSS for at least six months. They
can be returned to the custody of their parents in the sense
that the parents very much desire the children's return and,
on the basis of the parents' history with Katharine, they will
take good care of the children. From the view of DSS,
however, the very circumstance that triggered the removal of
the children, the parents' cocaine use, persists, and the parents
have refused to use offered services, namely a drug treatment
program.

The second pertinent subparagraph of G. L. c. 210, § 3(c),
is subparagraph (vii), and reads as follows:

> "because of the lengthy absence of the parent or the
> parent's inability to meet the needs of the child, the
> child has formed a strong, positive bond with his
> substitute caretaker; the bond has existed for a substan-
> tial portion of the child's life; the forced removal of the
> child from the caretaker would likely cause serious
> psychological harm to the child; *and* the parent lacks

---

[8] At oral argument, counsel for the children remarked, "They [the
parents] wouldn't go through withdrawal; he [the baby] had to."

the capacity to meet the special needs of the child upon such removal." (Emphasis supplied.)

In the case of Jeptha, his preadoptive home is the only home that he has ever known, and there was evidence that, as is only natural, a bond had formed between him and his appointed caretakers. The judge made no finding whether removal from those caretakers would likely cause serious psychological harm to Jeptha nor was any expert evidence received on the question. In *Petition of the Dept. of Pub. Welfare to Dispense with Consent to Adoption*, 383 Mass. at 591 n.16, the court, considering an earlier text of G. L. c. 210, § 3, declined to recognize a per se rule that bonds established between a child and prospective adoptive foster parents automatically trump the rights of biological parents. Subsequent cases expressed the view that the adverse impact of separation from a foster home when bonds had been established was subsidiary to the inquiry whether the biological parents were, at the time of inquiry, fit to be the custodial parents. See *Petition of the Dept. of Social Servs. to Dispense with Consent to Adoption*, 392 Mass. 696, 700 (1984); *Petitions of the Dept. of Social Servs. to Dispense with Consent to Adoption*, 20 Mass. App. Ct. 689, 694 (1985). The concern that informed that hesitation was that, if bonds with foster homes were decisive, then the very act of placing a child in a foster home pending judicial proceedings would determine the outcome because by the time those proceedings had concluded bonds would have been forged with persons other than the biological parents.

The 1992 amendment to § 3(c), which directs a court to consider positive bonds with a substitute caretaker as a factor in assessing parental fitness, gives those bonds more weight than they had in the decisional law.[9] To the extent that traumatic severance of bonds with a substitute caretaker became a decisive factor, a judge would be bound in findings to describe the nature of the bonds formed, why serious

[9]Subparagraph (vii) brings Massachusetts law a shade closer to legal commentators who have urged the primacy of psychological bonds. See Mnookin, Child-Custody Adjudication: Judicial Functions in the Face of Indeterminacy, 39 Law & Contemp. Prob. 226, 282-283 (Summer 1975); Foster & Freed, Child Custody, 39 N.Y.U. L. Rev. 613, 628-629 (1964). The possibility that bonding might determine the question of fitness was acknowledged in *Custody of a Minor*, 389 Mass. at 768.

psychological harm would flow from the severance of those bonds, what means to alleviate that harm had been considered, and why those means were determined to be inadequate. The final and conjunctive clause of § 3(c)(vii) places upon the severance trauma factor the qualification: "and the parent lacks the capacity to meet the special needs of the child upon such removal." The findings of the judge, which are focused on the parents' cocaine habit, do not touch on the parents' capacity to meet the emotional needs of Katharine and Jeptha. The situations of the two children are not, of course, the same. With Katharine, a parental bond had been established and has been maintained through continuing visits even while she has been in the custody of others.

The third pertinent subparagraph added to § 3(c) by the 1992 amendments is subparagraph (xii), and reads as follows:

> "a condition which is reasonably likely to continue for a prolonged indeterminate period such as alcohol or drug addiction, mental deficiency, or mental illness, and the condition makes the parent or other person named in section two unlikely to provide *minimally acceptable* care of the child." (Emphasis supplied.)

There is solid support in the record for the judge's findings that the parents have a cocaine habit, that they have not cooperated with programs through which they might shake off that habit, and that their habit will continue (the judge did not express this last finding, but we may infer it). What the evidence does not support is that the parents' cocaine habit has to date caused them to provide less than minimally acceptable care of Katharine. In the absence of a history of unacceptable care or testimony from an expert that child abuse and neglect is the inevitable end result of a cocaine habit, the prediction that such will occur is impermissible speculation.

It is helpful in this regard to consider the evidence in some further detail. The investigating social worker, Peter McKeon, when asked at the trial what needs of Katharine the parents had failed to meet, replied:

> "[T]he specific concern that the Department had [was] that they were using cocaine. We had no other evidence

that the child's needs were not being met beyond the parent's [sic] admission that they were using — actively using cocaine."

The examination continued as follows:

Q. "And did you have any evidence that [Katharine] was not being adequately supervised [or] cared for?"

A. "No."

Q." Did you have any evidence that [Katharine] was not receiving appropriate timely medical treatments?"

A. "No."

Q. "Do you have any evidence beyond the cocaine, the admission of cocaine use, that [Katharine] was not receiving the same kind of treatment as she would from you or I [sic] as a parent?"

A. "No."

Testimony of another social worker, Kenneth Kalian, was equally explicit that the concern of DSS was the cocaine habit, and that such an addiction translated to unfitness to be a parent. Kalian offered no observations of abuse or neglect of Katharine. As previously noted, a DSS social worker who followed the parents and Katharine during 1993 and early 1994 closed the case with an expression of "no concerns around [Katharine's] care."

Although the District Court judge found that the parents abused cocaine and had failed to make a serious effort to get off the drug, he did not find that Katharine had been physically or emotionally neglected. As in *Adoption of Stuart*, 39 Mass. App. Ct. at 389 n.14, the evidence did not support that critical finding.

Of course, neither agencies responsible for the welfare of children nor judges sitting on these sorts of custodial questions need to wait for inevitable disaster to happen. *Adoption of George*, 27 Mass. App. Ct. 265, 268 (1989). *Adoption of Michel*, 28 Mass. App. Ct. 260, 269-270 (1990). They may

consider past conduct to predict future ability and performance. *Custody of Two Minors,* 396 Mass. at 621. *Care & Protection of Stephen,* 401 Mass. 144, 152 (1987). *Adoption of Abigail,* 23 Mass. App. Ct. 191, 196 (1986). *Adoption of Michel, supra* at 269-270. It is one thing, however, to make a prognosis of damage to a child because of a previous pattern of abuse or neglect and quite another to predict catastrophe when the care of the child to date has been, on the whole, satisfactory[10] and, certainly, free of abuse or neglect. The termination of parental bonds is, after all, an "extreme step." *Adoption of Frederick,* 405 Mass. 1, 5 (1989). *Petitions of the Dept. of Social Servs. to Dispense with Consent to Adoption,* 20 Mass. App. Ct. at 694. In *Adoption of Carlos,* 413 Mass. at 349-350, the court approved the action of a trial judge who deferred decision about the "extreme step" because he foresaw hope for the mother attaining the requisite fitness in the future. Apart from the circumstance that there were current observations to support the judge's prognostication in *Carlos,* an estimate about the future rests on a more solid basis for justifying a temporary remedy (in the *Carlos* case keeping the child under care and protection) than for an irrevocable one such as dispensing with consent to adoption.

Ingesting cocaine is dangerous; its very possession is unlawful. We are not blind to the frequent linkage of cocaine addiction to personal and social disintegration. Both mother and father have been involved with larcenies and a drug offense, albeit before either child was born. That linkage has not, however, been demonstrated by evidence in this case to be

---

[10]There was evidence that when Katharine arrived at the foster home, she had what was varyingly described as a yeast or fungus infection in her vagina. That condition was not tied to neglect of hygiene, although the investigator assigned by the judge in accordance with G. L. c. 119, § 24, quoted the foster mother with whom Katharine had been placed as saying, "her general hygiene was not very good." Katharine was also reported by DSS as developmentally delayed in expressive speech. That condition, not noted in observations of Katharine while she was home, was marked in an "Early Intervention Program Screening/Evaluation Report" made October 21, 1994, five and one-half months after Katharine was placed in foster care. No evidence ascribed the expressive speech delay to deficiencies in the parents' care. No weight on this score may be ascribed to the untutored attribution of Katharine's speech delay to a neglected home environment, referred to in a second written report to the judge. For all that appears, the observed indications of developmental delay could be attributable to the emotional turmoil of having been placed in a foster home.

invariable or applicable to child neglect. In the absence of a showing that a cocaine-using parent has been neglectful or abusive in the care of that parent's child, we do not think a cocaine habit, without more, translates automatically into legal unfitness to act as a parent. We do not suppose that if a parent abused alcohol or had committed a crime such as larceny, but attended effectively to the feeding, clothing, medical care, and supervision of her child, that there would be an occasion for separating that parent forever from her child.

From the time that Katharine was taken into the custody of DSS and placed by that agency in a foster home, the parents have maintained contact with her. Visits that DSS arranged were with both children. Jeptha was wont to cry if either parent took him. The DSS suggests that the parents were inept, at best, or rejecting, at worst, as regards Jeptha. The record suggests, however, that the parents recognized they were strangers to the child and returned him to his familiars during visits to spare him anxiety.

On the record and findings before us, there is insufficient support for the judgment dispensing with consent to the adoption. Something more than a year and one-half has passed since that judgment was entered on April 28, 1995. It may be that facts have developed in the interim, other than the fact of the parents' cocaine addiction, which might place Katharine at risk. The case is remanded to the District Court for further inquiry in that regard and a new determination whether, consistent with what we have said in this opinion, either or both parents are fit as to Katharine. The judge, pending that inquiry, may, in his discretion, return Katharine to the custody of her biological parents and that may work as a useful test of their current capacity. On the record before us, DSS had not formulated an adoptive plan for Katharine (her foster parents did not wish to adopt her).[11] The second paragraph of G. L. c. 210, § 3(*c*), requires the judge to consider the plan of adoption proposed by DSS. Obviously, the judge cannot comply with that statutory mandate without a plan. The case of Katharine is difficult; that of Jeptha is more difficult. He has been in the foster care of preadoptive parents who are the only parents he has known. It would be a

---

[11]In its brief on appeal, DSS states that during the pendency of these proceedings, an adoptive home has been identified and that a plan of adoption is now definitive.

terrible cruelty to tear him from that home. The biological parents may recognize that and out of concern for Jeptha may consent to his adoption. Failing that, the District Court judge, as to Jeptha, shall inquire about the factors enumerated in G. L. c. 210, § 3(c)(vii), particularly whether the biological parents have the capacity to deal with the psychological trauma Jeptha would endure and the special emotional need he would have in consequence. On the basis of findings as to those factors, the judge shall make a new determination about the fitness of the parents, or either of them, as to Jeptha.

*So ordered.*