NOTICE: Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale. Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent. See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

22-P-1166

CARE AND PROTECTION OF EDWINA.[1]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The mother appeals from a judgment issued by a Juvenile Court judge pursuant to G. L. c. 119, § 26, finding the mother currently unfit to parent her child, Edwina, and committing the child to the permanent custody of the Department of Children and Families (DCF).[2]  In a thoughtful decision, the judge also found that DCF had not made reasonable efforts toward reunification and therefore ordered DCF to increase both the duration and frequency of the mother's parenting time with the child.  The mother appealed from the judge's determination that she is currently unfit to parent the child.  The mother first argues

---

[1] A pseudonym.

[2] As to the father, the judge found that he had engaged in serious acts of domestic violence against the mother, assaulting her at least once in the child's presence.  The father stipulated that he was unfit and that the child was in need of care and protection.  He was thus found "unfit as a result of being unwilling, incompetent, or unavailable."  The father did not appeal that decision.

that the trial judge failed to make sufficiently specific and detailed findings in that she did not address the mother's expert witness's testimony.  Second, she argues that the trial judge erred in finding her unfit to parent the child by clear and convincing evidence, asserting that she adequately managed her mental health and substance use challenges, was no longer in a relationship involving domestic violence, and had a sufficient plan for housing in the event that the child was returned to her care.  We remanded the case for the trial judge to supplement her findings and conclusions to address the evidence provided by the mother's expert witness.  Now that the trial judge has issued supplemental findings regarding the expert testimony, the mother argues that such findings are not entitled to traditional deference, as they were issued "nearly two years since the trial ended."  We affirm the judgment, but because we appreciate this concern raised by mother with respect to these findings, we tailor our decision to address them.

1.  Background. a. Factual history.  The mother has a history of challenges with mental health, substance abuse, and domestic violence.  She has been diagnosed with attention deficit hyperactivity disorder (ADHD), anxiety, and posttraumatic stress disorder (PTSD), and has been involuntarily hospitalized for mental health concerns three times, most recently in 2019 when the child was removed from her home.  At

2

the time of trial, the mother's only prescription medication was Adderall, although she had been prescribed other medications at other times.  The mother testified that she is an alcoholic, that she regularly uses marijuana, and that she has abused her prescribed medications in the past.  She also testified that all of her intimate relationships have involved domestic violence.

When the child was born in December 2018, a report was filed pursuant to G. L. c. 119, § 51A (51A report), alleging that both the child and the mother tested positive for amphetamines, and that the mother had tested positive for marijuana during her pregnancy.  This report did not result in removal of the child, as DCF determined that, despite the presence of amphetamines in both mother and child's blood, the mother was appropriately caring for the child.

In July 2019, DCF received another 51A report alleging that, while the mother and father were intoxicated, there was an altercation outside the maternal grandmother's home, and both parents were arrested.[3]  At the time of the incident, the maternal grandmother was inside the home with the child, who was about seven months old.  This incident led to DCF removing the child from the mother's care.  This was not the first incident

---

[3] There is some question as to whether the altercation was physical or not, as the 51A reporter stated that it was physical but the mother and father denied that.  Whether the altercation was physical or not has no bearing on our decision.

involving domestic violence that occurred while the child was in the parents' custody. In early 2019, while both the mother and father were intoxicated, the father pulled the mother's hair and threw her to the ground, and during that incident, the child was in a portable crib in the same room. The mother then called the maternal grandmother to pick up both the mother and the child. The mother did not, however, inform DCF about the incident. There were other incidents of domestic violence both before the child was born and after removal, the details of which are known to the parties and need not be recounted here. At the time of trial, the mother was no longer in a relationship with the father, although they were still legally married.

The mother has also struggled with housing instability during the pendency of this case. Between the child's birth and her removal, the mother lived with and paid rent to the maternal grandmother. For a brief period in 2020, after the child's removal, the mother and father were homeless, living out of a car at campsites. The mother has also stayed in a domestic violence shelter on two occasions since 2019. At the time of trial, the mother was living "off and on" with her uncle, but she did not think that home was an appropriate place for the child, as another resident of the home was abusing prescription drugs. She also did not think living with maternal grandmother would be appropriate for the child. The mother was on a housing

4

voucher list, and, if given custody of the child, planned to obtain a housing voucher.

b. _Compliance with action plans_. The mother's most recent action plan from DCF, dated October 2020, included the following tasks: meet with the social worker once a month, attend visits with the child and confirm them the day prior, engage in therapy and with the parent aide, take medications as prescribed, sign releases, submit Adderall blood levels, and obtain a neuropsychological evaluation. The mother has completed all tasks on the action plan except providing Adderall blood levels and obtaining a neuropsychological evaluation. Although DCF had not received blood tests showing consistent and appropriate Adderall usage, the DCF social worker testified that the mother's therapist and psychiatrist were not concerned about the mother's use of her prescription. As for the neuropsychological evaluation, the mother stated that it would be triggering for her, but did not provide any further explanation why she neglected to follow through with this requirement. The trial judge found that the mother had demonstrated an unwillingness to complete the evaluation. The mother did attend all visits with the child, arrived prepared with toys and snacks for the child, and behaved appropriately with the child.

c. _Mother's expert witness's testimony_. Over the course of the trial, which occurred in December 2021, the judge heard

5

testimony from three witnesses:  the mother, the DCF social worker, and the mother's expert witness.  The trial judge's findings of fact and conclusions of law, issued in March 2022, cited to the mother's and DCF social worker's testimony numerous times, but did not refer at all to the mother's expert witness's testimony.  The mother's witness, who was qualified as an expert in parenting assessments and trauma reactivity by the trial judge, was a social worker who completed a parenting evaluation of the mother.  This evaluation was based on meetings with the mother; speaking with her providers and the DCF social worker; reviewing the mother's records; and observing a one-hour visit between the mother and the child.

Because the judge made no findings or conclusions regarding the expert witness's testimony, we remanded for supplemental findings addressing what significance, if any, this evidence had on her determination of unfitness.

The trial judge submitted supplemental findings and conclusions in September 2023, stating which aspects of the expert witness's testimony the judge did and did not credit.  In a footnote she wrote, "The case in the Juvenile Court is currently in review and redetermination proceedings, wherein both [DCF] and the child seek termination of mother's parental rights.  Trial has been continued pending completion of a competency evaluation of mother after she sought on the one hand

6

to waive counsel and represent herself and, on the other, to stipulate to a judgment terminating her parental rights and to enter into an open adoption agreement."[4]

2. Discussion. a. Mother's expert witness's testimony. The mother originally argued that the lack of any mention of her expert witness in the trial judge's findings and conclusions meant that the trial judge had not made sufficiently specific and detailed findings. Now that the trial judge has issued supplemental findings addressing the expert testimony, the mother argues that, because the supplemental findings were issued nearly two years after the trial, they are not entitled to the deference traditionally given to a trial judge's findings of fact.

In determining that a parent is unfit to care for their child, a trial judge must make "specific and detailed" findings "so as to demonstrate that close attention has been given the

---

[4] This is not itself a case involving the possible termination of parental rights, and, having been informed at argument that a review and redetermination proceeding under G. L. c. 119, § 26, was pending, but stayed, in the trial court, we were concerned that our remand order might delay the ultimate resolution of the placement of the child. Consequently, in our remand order we said, "The pendency of this appeal (including this remand) shall not delay the Review and Redetermination Proceeding under G. L. c. 119, § 26, that we are informed is now pending in the trial court, which may proceed forthwith. The order currently under review in this matter and that is the subject of this order shall be of no force or effect in that review and redetermination proceeding."

evidence." Custody of Eleanor, 414 Mass. 795, 799 (1993). A judge's findings are entitled to substantial deference; they "must be left undisturbed absent a showing that they clearly are erroneous." Care & Protection of Martha, 407 Mass. 319, 327 (1990). A judge's assessment of a witness's credibility is also entitled to deference. See Petition of Dep't of Social Servs. to Dispense with Consent to Adoption, 397 Mass. 659, 670 (1986). However, the passage of time may call the accuracy of a judge's findings into question, particularly with regard to a witness's demeanor and credibility. See Adoption of Rhona, 57 Mass. App. Ct. 479, 486 (2003) ("We establish no per se rule or presumption concerning the length of time after which the accuracy of a judge's findings may be called into question. However, a lapse of three and one-half years after trial began and two years after trial ended strains the outer limits of any judge's ability to remember witness demeanor and credibility. In this case, a number of the judge's findings are contradicted by the evidence, suggesting that such limits were exceeded").

In the case at hand, only three months passed between the trial and the issuance of the original findings and conclusions. Cf. Adoption of Rhona, 57 Mass. App. Ct. at 486 (trial judge did not enter any findings until two years after end of trial). Although nearly two years passed between the trial and the issuance of the trial judge's supplemental findings, the

8

supplemental findings detail exactly which elements of the testimony the judge credited and those that she did not.  The trial judge stated that she credited the expert witness's testimony that the mother has PTSD, which renders her less able to control her emotional functioning and self-control when triggered.  However, the trial judge stated that she did not credit the expert witness's testimony that the mother's lack of control over her emotional functioning would not inhibit her ability to parent the child, particularly given the expert's limited observations of the mother and the child.  While we understand the concern about the length of time that has passed between trial and the judge's supplemental findings, we think it apparent based on an examination of the expert testimony and the judge's detailed findings that she considered the expert witness's testimony when making her original decision.[5]

---

[5] The mother need not be concerned that the determination of unfitness in this matter will be given deference in the review and redetermination proceeding, an issue she raised in a motion for reconsideration of our remand order.  It will not.  "In a proceeding to commit a child to the custody of the department under G. L. c. 119, § 26, the department bears the burden of proving, by clear and convincing evidence, that a parent is currently unfit to further the best interests of a child and, therefore, the child is in need of care and protection" (emphasis added).  Care & Protection of Erin, 443 Mass. 567, 570 (2005).  When Erin speaks of building on findings, it is clear that it means factual findings, not the legal conclusion of unfitness.  Consequently, the mother's motion is denied.

9

b. _Determination of unfitness_. The mother also argues that the trial judge's findings were insufficient to prove by clear and convincing evidence that she was unfit to parent the child. We disagree, as there was significant evidence supporting the trial judge's decision.

For a judge to commit a child to DCF's custody, DCF must prove, "by clear and convincing evidence, that a parent is currently unfit to further the best interests of a child." _Care & Protection of Erin_, 443 Mass. 567, 570 (2005). A finding that a parent is unfit requires "more than ineptitude, handicap, character flaw, conviction of a crime, unusual life style, or inability to do as good a job as the child's foster parent." _Adoption of Katharine_, 42 Mass. App. Ct. 25, 28 (1997). The judge must instead find "'grievous shortcomings or handicaps' that put the child's welfare 'much at hazard.'" _Id._, quoting _Petition of New England Home for Little Wanderers to Dispense with Consent to Adoption_, 367 Mass. 631, 646 (1975).

In finding the mother unfit to parent the child, the trial judge relied in part on concerns regarding the mother's mental health. Mental health concerns are relevant to a determination of parental unfitness if they "affect[] the parents' capacity to assume parental responsibility." _Adoption of Frederick_, 405 Mass. 1, 9 (1989). The mother has been diagnosed with ADHD, anxiety, and PTSD. On three occasions, most recently at the

10

time of the child's removal in 2019, the mother has been involuntarily hospitalized due to mental health concerns. To address these mental health challenges, the mother has been engaged in therapy and in treatment with a psychiatrist. The mother's psychiatrist has recommended that the mother take antianxiety medications, but the mother declined, as she did not believe her anxiety impacted her parenting ability.

While the trial judge did find that the mother's "mental health ha[d] improved over the duration of this case," she was concerned that the mother at times engaged in erratic and confrontational behavior. This behavior was evidenced by an occasion in May 2020 in which the mother sent approximately thirty e-mail messages to DCF and e-mailed the child's foster mother, and an August 2021 meeting in which the DCF social worker noted that the mother behaved erratically. The trial judge was also concerned that the mother would not "seek help to keep [the child] safe in the event of a mental health crisis or other stressor." Additionally, part of the mother's action plan required that she complete a neuropsychological evaluation, but the mother has refused to do so. This failure to comply with DCF's action plan demonstrates the mother's lack of insight into her own mental health challenges, a lack of transparency with DCF, and a failure to take advantage of all treatment and support options.

11

In addition to mental health challenges, the mother has struggled with substance abuse. Substance abuse is a relevant consideration in a determination of unfitness, but only where the substance abuse interferes with a parent's ability to provide minimally acceptable care of the child. See Adoption of Katharine, 42 Mass. App. Ct. at 31. The mother testified that she is an alcoholic, but stated that she has been sober since her pregnancy with the child. However, the mother has used alcohol on two occasions since the child's birth, which the mother considers to be relapses. She testified that she has not used alcohol since the child's removal, but she was intoxicated on that occasion. The mother also uses marijuana three to four times a week, and she tested positive for marijuana during her pregnancy with the child. The mother and the child both tested positive for amphetamines at the time of the child's birth. The mother testified that, in the past, she had abused her prescription medications, but she has since stopped and is no longer prescribed those medications. (The mother does attend a narcotics and alcoholics anonymous group, and has developed a relapse prevention plan with her therapist.)

The mother is prescribed Adderall for her ADHD, and DCF requested in its action plan that the mother submit blood tests showing appropriate Adderall usage. The mother has failed to comply with this aspect of her action plan. However, the

12

mother's therapist and her psychiatrist were not concerned about the mother's Adderall usage, and even the DCF social worker was unable to articulate at trial why DCF had concerns about the mother's Adderall levels.  Because "failure to comply with [DCF's] service plan is less important where the tasks in the plan are not closely related to any clearly identified parental deficiencies," Adoption of Zoltan, 71 Mass. App. Ct. 185, 192 (2008), we do not find the mother's failure to comply with this aspect of her action plan to be dispositive.  That said, her lack of cooperation with DCF by failing to provide the Adderall blood levels and the neuropsychological evaluation, as well as the mother's struggles with substance abuse, were appropriate considerations for the trial judge in her determination of unfitness.

The trial judge also remained concerned about the mother's history of domestic violence and her failure to report incidents of domestic violence to DCF.  A child who witnesses domestic violence "suffers a distinctly grievous kind of harm." Custody of Vaughn, 422 Mass. 590, 595 (1996).  "[A] judge must consider issues of domestic violence and its effect upon the child[] as well as a parent's fitness." Adoption of Gillian, 63 Mass. App. Ct. 398, 404 n.6 (2005).  All of the mother's intimate relationships have involved domestic violence, and the mother remained in each these relationships for several years.

13

The removal of the child was precipitated by an incident involving domestic violence between the mother and the father. Additionally, on two occasions since the child's birth, once before the child's removal and once after, the mother neglected to report incidents of domestic violence between the mother and the father to DCF. Although the child was present for only one of those unreported incidents, the trial judge was appropriately concerned that the unreported incidents signified that the mother would not report future incidents of domestic violence and thereby would not protect the child from harm. This finding by the trial judge was appropriate as, "[i]n determining parental fitness a judge may use past conduct to predict future ability and performance." Custody of Michel, 28 Mass. App. Ct. 260, 269-270 (1990). The mother is now separated from the father and testified that she would refrain from engaging in intimate relationships so as to protect the child from any domestic violence, but the trial judge relied on the mother's "pattern of remaining in relationships with domestic violence" in finding that this strategy was not realistic. The mother also failed to admit that the father was "an abuser," because he was intoxicated in each of the three instances of domestic violence. This denial demonstrates the mother's lack of insight into domestic violence.

The mother's housing instability also poses a considerable challenge to her care of the child. Housing instability is a "proper consideration[] in an unfitness determination." Adoption of Virgil, 93 Mass. App. Ct. 298, 303 (2018). Although the mother has lived with the maternal grandmother in the past with the child and currently lives with her uncle, she does not believe it would be appropriate for the child to live with either relative. If the mother were to obtain custody of the child, she hoped to receive a housing voucher, for which she was on a list. (The mother also testified that she could seek placement at a Department of Transitional Assistance shelter, though the judge made no finding on the point. Despite engaging with a parent aide who assisted her with housing, the mother appears not to have obtained such housing.) The trial judge found it likely that the housing instability that mother has displayed would continue even if the child were returned to her care.

We acknowledge that the mother has, as the trial judge found, "engaged in many of the services requested by [DCF]" and has made significant progress. However, we also conclude that, considering the evidence discussed above, the trial judge did not err in finding by clear and convincing evidence that the mother was, at the time of trial, unfit to care for the child. We note that many of the concerns laid out above could be

transitory, and the question of unfitness will of course have to be redetermined on the current record in the pending review and redetermination proceeding, as more than two years have passed since the trial.

Judgment affirmed.

By the Court (Rubin, Neyman & Walsh, JJ.[6]),

Assistant Clerk

Entered:  March 8, 2024.

---

[6] The panelists are listed in order of seniority.