NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case.  A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

23-P-303

ADOPTION OF QUAYLA.[1]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The mother and the father appeal from decrees of the Juvenile Court terminating their parental rights to their daughter, Quayla, pursuant to G. L. c. 119, § 26 and G. L. c. 210, § 3, approving the plan of the Department of Children and Families (DCF) for the child's adoption, and ordering two postadoption visits per year between the parents and Quayla.[2]  In their appeals, the parents argue that the trial judge erred in finding them unfit to parent their child by clear and convincing evidence, that there was no nexus between the parents' substance

---

[1] A pseudonym.

[2] The father also filed a notice of appeal from the denial of his motion for relief from judgment.  In his brief, the father states he is appealing from the decree terminating his parental rights.  He makes no argument regarding the denial of his motion for relief from judgment, and we do not consider that issue.  See Mass. R. A. P. 16 (9) (A), as appearing in 481 Mass. 1628 (2019).

abuse and any harm or neglect to the child, and that it was not in the child's best interests for their parental rights to be terminated.  We affirm.

Background.  1.  Factual history.  We summarize the facts as they were found by the trial judge.  Both the mother and father have a history of substance abuse.  The mother has been diagnosed with opioid dependence, and the father has admitted to having a "drug problem."  Both parents have also been charged with various criminal offenses.  In addition to struggling with substance abuse, the mother has been diagnosed with depression, anxiety, and attention deficit hyperactivity disorder (ADHD), and she has not maintained consistent treatment for her mental health diagnoses.

During her pregnancy with the child, the mother was engaged in methadone maintenance, but despite that, tested positive for opiates and benzodiazepines on several occasions and admitted to using heroin a week or two before the child's birth.  The father was aware of the mother's heroin use.  In August 2015, the child was born with neonatal abstinence syndrome; her urine and meconium tested positive for opiates and methadone.  The child experienced withdrawal symptoms and was placed on neonatal morphine.  Because she was born substance exposed, a report was filed with DCF pursuant to G. L. c. 119, § 51A (51A report).

The child was placed in DCF custody, and DCF placed her in a kinship foster home with her aunt and uncle. The child was reunified with her parents in June 2016.

Between 2016 and 2019, the mother continued to struggle with substance abuse, testing positive for fentanyl twenty times and for cocaine twice. However, she did not inform DCF of these relapses. In August 2019, the police were called to the parents' apartment complex due to a report of a woman in the parking lot who appeared to be changing her clothes. The police arrived and found the mother in the parking lot, and she presented as slow and lethargic. The mother brought the police to her apartment, where the father and the child were sleeping. The apartment was in disarray, with tables knocked over or lopsided and items all over the floor. The police observed drug paraphernalia, namely, a spoon and a bag of syringes, in the apartment. The father had track marks on his arms, and admitted to the police that he had a drug problem. He claimed the track marks were old, but the police observed bruising around the marks, which indicated that they were new. The mother told the police that she had not used drugs in a year, despite the fact that she had actually tested positive for drugs several times in the preceding months. Based on this incident, the police filed a 51A report.

A few days after the incident, DCF conducted an unannounced home visit, and found that the home was in "deplorable condition." According to the DCF social worker, the sink was overflowing with dirty dishes, there was a knife on the counter that was accessible to the child, there was a table tipped over and boxes on the floor around it which blocked one entrance to the bathroom, and there were cigarette burns on the parents' bedding and cigarette trash on the parents' dresser. At the time, the mother refused to sign a release for her treatment providers and refused to allow the social worker to inspect her medication bottles. The social worker attempted to arrange another home visit so that she could meet the father, but the mother canceled one visit and would not arrange another, as she stated the father would not be available. The social worker attempted to create a plan for the child to stay with a family member while DCF confirmed the parents' sobriety, but the mother refused.

As part of the DCF investigation into the 51A report, the social worker also spoke with the child's aunt, who expressed concern about the parents' drug use. The aunt claimed that both parents appeared to be under the influence at Christmas, and that the mother appeared to be under the influence two weeks earlier when she had dropped off the child for an overnight

4

visit.  During that visit, the aunt observed that the child had two burns on her hand.  The aunt reported that when the aunt asked the mother about the burns, the mother claimed that the child "ran into the cigarette."  Following this DCF investigation, the child was again removed from the parents' care, and was placed in the same kinship foster home with her aunt and uncle in which she previously had been placed.

Since the child was removed the second time, the parents have not consistently cooperated in DCF's efforts to verify their sobriety.  The mother was not consistent with her methadone dosing, and she tested positive for fentanyl numerous times between 2020 and 2021.  She did not, however, inform DCF of these positive tests, instead only providing to DCF select toxicology screens that were negative for illicit substances.  The mother also did not seek detoxification following any of these relapses, and she provided no verification of a relapse prevention plan.

The father completed a substance abuse evaluation in October 2019, but it referred only to historical information and did not include any clinical assessments or tests, so DCF did not accept the evaluation as fulfilling the task on his action plan.  The father completed another substance abuse evaluation in April 2021, eighteen months after it was requested, but the

evaluation was largely based on the father's self-report, and he made several inconsistent or inaccurate statements during the evaluation.  At each home visit, DCF asked Father to verify his sobriety and to submit to toxicology screens, but he only submitted one toxicology screen, otherwise refusing.

The parents also did not refrain from illegal activity while the child was in DCF custody.  The mother was charged with larceny in January 2021, although she alleges that she was falsely accused.  The mother claims that the charge has since been dismissed, but she did not provide verification, and, at the time of the termination trial, the charge remained in open status.  In May 2021, the father was charged with a compulsory insurance violation and a registration violation, although these charges were later dismissed.

Since the child's second removal, the parents have consistently attended visits with the child and have behaved appropriately at those visits.  During one visit in 2020, the father presented with heavy eyelids, prompting concern about his sobriety.  The father completed an unsupervised toxicology screen several weeks later, but he refused to complete a supervised screen within twenty-four hours as requested by the DCF social worker.  Additionally, the parents have interfered with the child's kinship foster placement, badgering the aunt

and uncle and making their relationship uncomfortable.  As a result, the child was removed from the kinship foster placement in June 2020 and placed in a DCF foster home, although the aunt and uncle remained involved in the child's life, visiting her and taking her on vacation.  The aunt and uncle are willing to adopt the child upon termination of the parents' parental rights.

2.  <u>Procedural history</u>.  Shortly after the child was removed from the parents' care in 2019, the parents both waived their rights to a temporary custody hearing.  Neither parent attended the unfitness hearing in July 2021.  The trial judge found that the mother was unfit, but that DCF had not met its burden of proof as to the father's unfitness.  The court entered a conditional custody order to the father, with the requirement that the father not allow anyone, including the mother, to spend the night at the father's residence unless approved by DCF.  In violation of this order, on the child's first overnight visit with the father under the order, the father allowed the mother to sleep over.  The court therefore vacated the conditional custody order and found that both the mother and the father were unfit to parent the child.  The parents did not appeal from that decision.

The court held a termination of parental rights trial in June 2022, and again, neither parent was present.  The trial judge found that both the mother and the father were unfit, committed the child to the permanent custody of DCF, terminated both parents' parental rights, approved DCF's plan of adoption by the kinship foster family, and ordered that the child have visits with the parents a minimum of two times per year.  Both parents appealed from this decree.

Three months later, the father filed a motion for relief from judgment, arguing that he was unable to attend the termination trial because it was rescheduled and he was not provided proper notice of the new date.  After an evidentiary hearing, the trial judge denied the father's motion, as she did not credit the father's testimony and instead found that he was aware of the trial date.  As discussed in note 2, supra, the father does not make any arguments about it in his brief, so we need not consider this issue.  See Mass. R. A. P. 16 (9) (A), as appearing in 481 Mass. 1628 (2019).

Discussion.  The parents both argue that the judge erred in finding them unfit to parent the child and in terminating their parental rights, because they allege there was no nexus between their substance abuse and any harm to the.  We disagree.

8

To commit a child to DCF's custody, DCF must prove, "by clear and convincing evidence, that a parent is currently unfit to further the best interests of a child." Care & Protection of Erin, 443 Mass. 567, 570 (2005). To find that a parent is unfit requires "more than ineptitude, handicap, character flaw, conviction of a crime, unusual life style, or inability to do as good a job as the child's foster parent." Adoption of Katharine, 42 Mass. App. Ct. 25, 28 (1997) ("Katharine"). The trial judge must instead find "grievous shortcomings or handicaps that put the child's welfare much at hazard." Id., quoting Petition of New England Home for Little Wanderers to Dispense with Consent to Adoption, 367 Mass. 631, 646 (1975). For termination of parental rights, DCF must further prove by clear and convincing evidence that the child's best interests are served by the termination of parental rights. Adoption of Luc, 484 Mass. 139, 144 (2020). On appeal, a trial judge's findings "must be left undisturbed absent a showing that they clearly are erroneous." Care & Protection of Martha, 407 Mass. 319, 327 (1990).

Substance abuse is a relevant consideration in a determination of unfitness, but only where the substance abuse interferes with a parent's ability to provide minimally acceptable care of the child. See G. L. c. 210, § 3 (c) (xii);

9

Katharine, 42 Mass. App. Ct. at 31. In Katharine, the parents both used cocaine regularly and resisted services offered by the Department of Social Services (DSS)[3] to help treat their addictions. Id. at 25-26. This court found that, even assuming the parents would continue to use cocaine, id. at 31, their addictions did not "translate[] automatically into legal unfitness to act as a parent" absent neglect or abuse of the child, id. at 34. The findings in Katharine did "not reflect a history of negligent or abusive care of the daughter," but rather showed that the parents had "adequately fed and clothed her, provided for her medical care, supervised her, and loved her." Id. at 26. The daughter in that case had been born prematurely and with cocaine in her system, id. at 25, which could potentially be characterized as abuse (although the court did not decide that question), but this court found that it was not enough alone to permit termination of parental rights, as it could not be repeated as to that child, id. at 28-29. Finally, this court considered that the parents had been involved in criminal offenses in the past, but noted that those had occurred before the daughter was born. Id. at 33.

---

[3] The Department of Children and Families was formerly named the Department of Social Services.

We find that, contrary to the parents' arguments, this case is distinguishable from Katharine. As in Katharine, the child was born substance exposed, and the parents both had drug addictions but nonetheless were resistant to services offered by DCF. Those facts alone are not sufficient, under Katharine, to terminate parental rights. However, there is additional evidence of neglect and harm to the child in this case that was not present in Katharine. When the child was removed from the parents' care the second time in August 2019, the home was in disarray, with tables knocked over and items all over the floor. Days later, the home remained in "deplorable condition": during an unannounced home visit, the social worker observed a tipped over table, boxes on the floor blocking an entrance to the bathroom, and a knife on the counter that was accessible to the child. The police also observed drug paraphernalia in the home. The condition of the home on both occasions posed a risk to the then four-year-old child.

Additionally, the child's aunt reported to the DCF social worker that during a visit two weeks earlier, she had noticed burns on the child's hand, and the mother had stated they occurred when the child "ran into a cigarette." Whether the burns were caused intentionally or accidentally, they are at the very least evidence that the child was not being sufficiently

11

supervised.  Taken together with the cigarette burns observed on the parents' bedding and cigarette trash on their dresser, the evidence suggests that the parents were not taking adequate precautions while smoking.

Finally, neither parent refrained from engaging in illegal activity during the course of the DCF case.  The mother was charged with larceny in January 2021.  Although she claims that she was falsely accused, and stated that the charge had been dismissed, the judge was not bound to credit that testimony.  In May 2021, the father was charged with a compulsory insurance violation and a registration violation, although those charges were later dismissed.  While the parents in Katharine both had been involved in criminal offenses prior to the child's birth, they were not involved in any after the child's birth, let alone during the pendency of the DSS case against them.  Katharine, 42 Mass. App. Ct. at 33.

Therefore, the parents' argument that this case is indistinguishable from Katharine fails.  As this Court held in Katharine, a court cannot "predict catastrophe when the care of the child to date has been, on the whole, satisfactory," but the court may "make a prognosis of damage to a child because of a previous pattern of abuse or neglect."  Id. at 33.  As the child in this case has been harmed as a result of the parents'

12

substance abuse, termination of their parental rights is not barred by Katharine.

The mother also argues that the judge's findings that she "cherry-picked" and altered her drug screens were clearly erroneous. The judge found that the mother selected only certain screens to send to DCF, all of which showed she tested negative for illicit substances, despite the fact that other screens that she chose not to send showed a positive result. She also found that the mother had altered certain screens before sending them to DCF. The mother argues that there was no evidence in the record to support these findings, as the DCF court reports state only that DCF "received" drug screens, but do not specify from whom, so the mother may not have had any discretion over which screens DCF received or what they said.

The judge's findings on this issue were not clearly erroneous, as there was testimony supporting them. At the hearing on July 20, 2021, the DCF social worker testified that the mother had signed only limited releases for her providers, meaning that DCF could not access the drug screens directly from the mother's provider. Then, at the termination trial on June 16, 2022, another DCF social worker testified that DCF had previously received drug screens directly from the mother and that she had finally signed releases in May 2022. The social

13

worker also testified that a screen the mother had given DCF was altered and did not match the screen provided directly from the provider. From this testimony, the judge reasonably found that the mother selected only certain favorable screens to send to DCF and altered at least one.

The father argues that the judge made a clear error in finding that he struggled with substance abuse at the time of trial. DCF bears the burden to show by clear and convincing evidence that a parent is currently unfit. Care & Protection of Erin, 443 Mass. at 570. The evidence before the court showed that the police observed track marks on the father's arms in August 2019, which the father stated were old, but the police officer saw bruising around them, which he stated indicated that they were new. The police also observed drug paraphernalia in the home at that time, and the father admitted to police that he had a "drug problem." The father submitted the results of a substance abuse evaluation to DCF in October 2019, but it did not indicate what, if any, testing was completed, and mostly contained information about the mother. Therefore, DCF requested a new substance abuse evaluation, which father did not complete until April 2021, and which the court found contained contradictory statements.

The father is correct that his action plans, unlike the mother's, did not require that he submit drug screens to DCF, although they did require that he "[a]bstain from all alcohol and drug use and demonstrate a commitment to maintaining a sober lifestyle by refraining from engaging with individuals who are using/abusing alcohol/drugs."  In December 2021, a task was added stating, "If there are concerns regarding presentation and sobriety during visitation, [DCF] . . . will encourage you to submit a supervised drug screen/swab/blood test within 24 hours."  There was also testimony from the DCF social worker that DCF had asked the father to verify his sobriety at every home visit since the case opened, at least thirty-three times. The court found that the father had only submitted one drug screen to DCF, which was unsupervised, several weeks after a February 2020 visit at which he presented with heavy eyelids. The court also found that a supervised screen was requested, but the father failed to submit one, and the judge drew the inference that it would have been positive.  The father contends that he had actually taken five drug screens since the DCF case opened, as he reported during his second substance abuse evaluation.

The judge's findings regarding the father's failure to maintain sobriety were not clearly erroneous.  When the child

15

was removed, the police officer observed what he said were new track marks on the father's arms, and drug paraphernalia in the home. The father was also not forthcoming in either of his substance abuse evaluations about his history of drug use. Although his action plans did not require that the father submit drug screens, they did require that the father "[c]ooperate with any additional recommendations made by DCF and other professionals," and the DCF social worker testified that the father was asked to verify his sobriety at every home visit throughout the pendency of the case. Although the father did report during his substance abuse evaluation that he had taken five drug screens since the case began, he did not report that they had been submitted to DCF. Taken together, this evidence was sufficient for the judge to find that the father had a current substance abuse issue at the time of trial.

Even if the judge did err in her finding's regarding the father's substance abuse, any error would have been harmless, as there was other evidence sufficient to show the father's unfitness. The father, despite knowing about the mother's substance abuse, including her use of heroin during pregnancy and her relapses, did not report it to DCF or to the mother's substance abuse treatment provider, nor did he take any steps to protect the child from potential harm or neglect caused by the

mother.  Even after the trial judge had found the mother unfit and issued a conditional custody order to the father, the father immediately violated the order by allowing the mother to sleep over during the child's first overnight visit with him.  As we have already concluded that the child was harmed due to the mother's substance abuse, the father's failure to acknowledge this as an issue and his willingness to put the child at risk of harm constitute unfitness.  The father and the mother also failed to attend either hearing at which their fitness to parent the child would be decided, and it was proper for the judge to draw a negative inference from their absence.  See Adoption of Talik, 92 Mass. App. Ct. 367, 371 (2017).

Finally, both the mother and the father challenge the judge's determination that termination of their parental rights was in the child's best interest.  In particular, the father argues that the judge did not consider the father's ability to provide for the child and their strong relationship , and the mother argues that the child expressed a desire to return home and was bonded with the parents.  In fact, the judge took note of the parents' jobs and financial situation, including the fact that the maternal grandmother had provided financial support to the parents.  The judge also explicitly considered the parents' mostly consistent compliance with visitation, the fact that they

17

behaved appropriately and came prepared, and the child's expressed desire to return to the parents' care.  In a best interest determination, the court should take into account the child's wishes, but they are not outcome determinative.  See Adoption of Nancy, 443 Mass. 512, 518 (2005).  The court clearly did consider the bond between the child and the parents, as she ordered post-adoption visitation.  However, the judge should also consider a lengthy separation between the parents and child, and a child's bond with the current custodian.  See Adoption of Frederick, 405 Mass. 1, 7 (1989).  In this case, the child has not lived with the parents since 2019 and has developed a strong bond with her aunt and uncle, who are willing to adopt her.

The mother also argues that, because the kinship foster family did not allow the child to continue living with them after June 2020, their adoption of the child would not be in her best interests. However, the judge found that the kinship foster family had made that decision due to the parent's interference and fears that the child would be removed a third time.  The family also maintained a relationship with the child even after June 2020, visiting with her consistently and taking her on vacations.

Based on all of these considerations, the judge did not abuse her discretion in finding that the child's best interests would be served by termination of parental rights.

Decrees affirmed.

Order denying motion for
  relief from judgment
affirmed.

By the Court (Vuono, Rubin &
  Smyth, JJ.[4]),

*Paul Little*

Clerk

Entered:  June 27, 2024.

---

[4] The panelists are listed in order of seniority.