NOTICE: Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale. Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent. See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

22-P-692

ADOPTION OF VERONIQUE.[1]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

This case involves a child, Veronique, who was removed from her mother's custody in November 2018, shortly after she was born, because, among things, cocaine was found in a test of the child's meconium, and because of the history of the mother's abuse of her older children, Jasmin and Skye.[2] The mother appeals from a decree of the Juvenile Court terminating her parental rights to Veronique pursuant to G. L. c. 119, § 26 and G. L. c. 210, § 3,[3] and approving the plan of the Department of Children and Families (DCF) for the child's adoption by her current foster family. The mother argues that the judge erred

---

[1] A pseudonym.

[2] Also psuedonyms.

[3] The father's parental rights were also terminated, but he does not appeal.

in finding that she was unfit and that termination of her parental rights was in the child's best interests.  She also argues that the judge erred and abused her discretion in failing to meaningfully evaluate the competing adoption plans.  We affirm.

1.  Termination of parental rights.  For a child to be committed to DCF's custody, DCF must prove, "by clear and convincing evidence, that a parent is currently unfit to further the best interests of a child."  Care & Protection of Erin, 443 Mass. 567, 570 (2005).  For termination of parental rights, DCF must further prove, by clear and convincing evidence, that the child's best interests are served by the termination of parental rights.  Adoption of Luc, 484 Mass. 139, 144 (2020).  On appeal, a trial judge's findings are entitled to substantial deference; they "must be left undisturbed absent a showing that they clearly are erroneous."  Care & Protection of Martha, 407 Mass. 319, 327 (1990).  In this case, there was clear and convincing evidence of the mother's unfitness.

a.  Domestic violence and abuse and neglect of the mother's older children.  To begin with, the trial judge considered the mother's history of domestic violence in finding that she was unfit and that termination of her parental rights was in the child's best interests.  "Violence within a family is highly relevant to a judge's determination of parental unfitness and

2

the best interests of the child[].  As such, a judge must consider issues of domestic violence and its effect upon the child[] as well as a parent's fitness."  Adoption of Gillian, 63 Mass. App. Ct. 398, 404 n.6 (2005), citing Care & Protection of Lillith, 61 Mass. App. Ct. 132, 139 (2004).

Prior to Veronique's birth, there were several allegations of domestic violence between the mother and her two older children.  The judge found that in 2011, a report was filed pursuant to G. L. c. 119, § 51A (51A report) alleging that the mother was intoxicated and verbally abusive to her oldest child, Jasmin, who was thirteen years old at the time.  The reporter claimed having to separate the mother and Jasmin, as Jasmin threw a chair at the mother while they were arguing.  There was also an allegation in the report that the mother left Skye, the one year old middle child, outside for five to ten minutes on multiple occasions and did not recognize that that was a safety issue.  During DCF's investigation, the mother and Jasmin confirmed that they had fought, although Jasmin told the investigator that the mother was not intoxicated, but rather sick with the flu.  As a result of this incident, Jasmin was removed and, according to the mother, not returned to the mother's care for approximately one year.

The judge also found that another 51A report was filed in 2014, alleging that the mother frequently had loud fights with

3

Jasmin that involved screaming, swearing, and broken furniture. The report also alleged that there was ongoing marijuana use in the home and that the mother would frequently send Skye out to play unsupervised. During the investigation, the mother and Jasmin confirmed that they had verbal arguments with inappropriate language, but said they were working through their issues and did not have physical altercations. The mother also stated that the neighbor who had made the report had been harassing her, and that she had a harassment prevention order against the neighbor. DCF found the allegations unsupported.

According to the judge's findings, in 2016, two years before Veronique's birth, a 51A report alleged that, when the mother was called to discuss Skye's behavior at school, she told the reporter that she had "just beat the shit out of her" and was "ready to give [Skye] up." When Skye, who was six years old at the time, arrived at school, she informed the reporter that the mother had hit her with a broom handle. She had open wounds on her palm, hip, and buttocks, and her body was covered in bruising and red swollen welts. She was also smelly, not wearing any underwear, and wore soiled clothing. The next day, another 51A report was filed alleging that Skye had been sexually abused by a man who babysat her.

During DCF's investigation of these reports, Skye told the investigator that the mother hit her with a broken broom and

4

punched her, causing a tooth to fall out. She also stated that she had been locked in her room the night before, was not allowed to eat or drink, and could not leave the room except to use the restroom. She was taken to the hospital, where she denied any sexual abuse. At the hospital, Skye wet the bed and urinated on herself at least four times. Skye was removed from the mother's care and was placed in a program, where she stated that her babysitter had touched her inappropriately several times, although she later denied the sexual abuse when speaking to an investigator. The program in which Skye was placed reported that she had lice. The mother denied that Skye had lice and denied ever hitting her. Jasmin reported that Skye had had a hair barrette in her mouth and when the mother removed it, Skye's tooth also came out. DCF workers observed no locks on the outside of any of the home's bedrooms. DCF found the allegations of sexual abuse unsupported but found the allegations of neglect and physical abuse by the mother supported. The mother's parental rights to Skye were subsequently terminated in 2019.

The mother was charged with domestic assault and battery, to which she pleaded guilty, according to her own testimony. When questioned about the incident at trial, the mother stated, "the teacher had lied and said I hit my daughter, and I did not do it." Later in the trial, when she was asked about the charge

5

again, she stated, "I remember that false lie, yes." The mother stated during trial that she did not want to talk about her older children, which the judge found to be indicative of the mother's "general pattern of avoidance when things are challenging for her."

In addition to the allegations that the mother was abusive toward her two older children, the mother also had a history of domestic violence with Veronique's father. The judge found that the mother's relationship with the child's father, which the mother described as "on and off" and "hot and cold," ended shortly after the child's birth. The mother alleged that the father was physically and mentally abusive towards her, and that she was concerned for her safety a few times during that relationship. The judge found that the mother had a harassment prevention order against the father between March 2018 and March 2019. The mother testified that she last had contact with the father in spring 2020, but the judge did not credit this testimony, as it contradicted a DCF social worker's testimony that, according to the mother, she was last in contact with the father in spring 2021.

During the mother's testimony, she repeatedly stated that she did not want to talk about the father. The judge found this to be "indicative of Mother's tendency to avoid topics with which she is uncomfortable," and was concerned that it meant

6

that the mother was "unwilling[] to reflect on such topics in a manner that would allow Mother to learn from her history and demonstrate growth."

The mother argues that the judge's conclusion that she has not distanced herself from domestic violence concerns is inconsistent with the finding that she has not spoken with the father for more than half a year. Relatedly, she contends that, for the same reason, there is no evidence that the child would be at risk of domestic violence. We do not find either of the judge's conclusions to be clearly erroneous. The mother has shown an inability or unwillingness to discuss concerns regarding domestic violence, which indicates that she has not meaningfully reflected on how domestic violence has impacted her and could again in the future. This is also evidenced by the judge's finding that, at trial, the mother was unable to define a "healthy relationship" beyond making the tautological statement that it is "not an unhealthy relationship." Additionally, the judge did not credit the mother's testimony that she had not seen the father for one and a half years, instead crediting the social worker's testimony that it had been only six months.

The mother asserts that the judge's discussion of her 2016 conviction of assault and battery improperly relied on stale evidence, for which she cites Adoption of Ramona, 61 Mass. App.

7

Ct. 260, 264-266 (2004).  The mother is correct that "a determination of unfitness must be based on current evidence," and that "the judge is required to assess whether a parent is currently fit."  Id. at 264.  In Ramona, this court vacated the termination of the mother's parental rights to two of the subject children, id. at 266, as the "bulk" of the judge's findings of the mother's unfitness regarding those two children "rested upon events occurring more than two years prior to trial, even though recent evidence of the mother's parenting was available."  Id. at 264.  However, Ramona is distinguishable from the case at hand, as the 2016 conviction played only a small role in the judge's conclusions, and the judge relied mostly on other, more current information in finding the mother unfit.  Furthermore, the multiple allegations of domestic violence against the two older children indicated a pattern of behavior, which the court may consider, see id., and that may have prognostic value.  Finally, the mother's denial regarding the physical and verbal abuse of her children and her inability or unwillingness to discuss them demonstrate that the mother has not taken responsibility for her actions, including those leading to her conviction.

b.  Mental health.  Mental health concerns are also relevant to a determination of parental unfitness if they "affect[] the parents' capacity to assume parental

8

responsibility." Adoption of Frederick, 405 Mass. 1, 9 (1989). The judge found that the mother has been diagnosed with post-traumatic stress disorder (PTSD), anxiety, and depression, and that she does not currently take medications to treat any of these disorders. According to the judge's findings, when the mother was pregnant with the child, she was hospitalized for psychiatric reasons, and she told the hospital that if she left and something happened to her, the hospital would be liable. The mother denied that she told the hospital that she would harm herself. The judge found that later, while in the hospital during and after Veronique's birth, the mother exhibited manic talking and she asked to tape mittens to the child's hands.

Due to its concerns regarding the mother's mental health, DCF's action plan for the mother required her to complete a psychiatric evaluation, engage in therapy, and apply for services through the Department of Mental Health (DMH). The mother reported that she had completed a psychiatric evaluation, although she did not recall when that occurred and DCF has not received confirmation of any such evaluation. The mother later attended a single visit with a psychiatrist pursuant to her action plan and stated that she was told that follow-up appointments were not needed and that the recommendation was for her to remain in counseling. The judge found that the mother was unable to offer insight as to why DCF had requested that she

9

see a psychiatrist.  The mother began therapy in December 2018, switching therapists in September 2021.  The mother has not signed releases, so DCF has been unable to confirm the mother's engagement in therapy.  Despite that, the judge found that the mother attended therapy consistently for two years.  The judge did not credit the mother's testimony that she applied for DMH services but that a DCF social worker told her that she did not need that service, so she did not follow up.

Despite her engagement with mental health services, at trial, the mother was unable to define a "healthy relationship" when asked.  She then stated that she did not feel like answering those questions.  The mother also testified that she does not struggle with her depression or PTSD because "life goes on."  The judge found that the mother "has a pattern of saying she does not recall things or does not want to talk about things that she does not wish to discuss," and as noted above, that this behavior is "indicative of Mother's general pattern of avoidance when things are challenging for her."  The judge also found that the mother "was unable to demonstrate progress regarding her mental health [and] failed to show growth or apply skills learned in therapy to her life."  The judge was appropriately concerned that the mother's lack of progress or focus on her mental health were "worrisome indications that

10

Mother is not prepared to appropriately care for the subject child."

The mother argues that the judge's finding that she "does not engage in any preventative care for her mental health concerns" was clearly erroneous, because the judge also found that she was attending therapy.  While it may have been error for the judge to state that the mother did not engage in any preventative mental health care, DCF has been unable to confirm the mother's engagement in treatment due to her unwillingness to sign releases.  Because the judge acknowledged multiple times that the mother had been attending therapy for two years and took that into consideration in making her decision, we conclude that any error in the challenged finding was harmless.

The mother also contends that it was impermissibly speculative for the judge to conclude that she has not addressed her mental health diagnoses because she denied that she "struggles" with them.  We disagree.  The judge did not rely solely on that statement from the mother's testimony, but rather also considered the mother's inability or unwillingness to testify regarding topics that upset her, as well as her refusal to sign releases, which would have allowed DCF to verify whether or not the mother was progressing in therapy and whether her psychiatrist believed that she needed medication to appropriately deal with her mental health diagnoses.

11

Relatedly, the mother challenges the judge's conclusion that she has "failed to learn from . . . services" as she addresses her mental health in counseling. Contrary to the mother's argument, this finding is not contradictory to the judge's finding that the mother has engaged in therapy; rather, it implicitly recognizes that she is engaging in services such as therapy, but concludes that those services have not been effective. The judge's conclusion that the mother has not adequately addressed her mental health issues is supported by the evidence.

c. Physical health. A parent's failure to seek medical treatment for herself can result in danger to the child. See Petition of the Dep't of Social Servs. to Dispense with Consent to Adoption, 16 Mass. App. Ct. 965, 965 (1983). The mother has been diagnosed with kidney shrinkage, her left kidney does not function, and she has a low immune system due to low white blood cell count. The judge found that the mother has a kidney doctor, but she does not have a treatment plan and does not see the kidney doctor for regular appointments, instead going only when she feels she needs to. At trial, the mother did not remember when she last saw her kidney doctor. She does, however, see a primary care doctor for an annual checkup and if she feels sick.

12

While the mother's physical ailment does not indicate that she is unfit to care for her child, it raises a concern that the mother may not be vigilant about her child's healthcare needs. That inference is supported by the fact that there were previously concerns about the unmet healthcare needs of the mother's two older children, and that her prenatal care during her pregnancy with Veronique was inconsistent.[4]

d. Substance abuse. Substance abuse is a relevant consideration in a determination of unfitness only where it interferes with a parent's ability to provide minimally acceptable care of the child. Adoption of Katharine, 42 Mass. App. Ct. 25, 31 (1997). In this case, Veronique was born on November 1, 2018. A 51A report alleged that the child's meconium tested positive for cocaine, which is to say she was born substance exposed. The mother reported that she had used cocaine and marijuana beginning in the summer of 2018, but had stopped when she learned that she was pregnant, although she claimed that was relatively late in the pregnancy. Though the judge did not make a finding on the point, there was evidence that the mother had her first prenatal care appointment in May

_____

[4] Jasmin is now an adult, but when she was a child, she was removed from the mother's care on multiple occasions. Skye was removed from the mother's care in 2016 and the mother's parental rights to her were terminated in 2019.

2018, and at another appointment in August, she refused to submit a urine screen, stating she might not be "clean."

After the child's removal, which occurred only five days after her birth, there were further 51A reports filed alleging, among other things, that the mother was using drugs. The mother testified that she had not used cocaine or any substances other than alcohol since giving birth. As part of the mother's action plan, DCF did not require that the mother provide drug screens, but did require her to complete a substance abuse evaluation, provide DCF with a copy of the evaluation, and follow all recommendations. The mother claims that she completed a substance use evaluation and that she was not diagnosed with a substance use disorder. She did not provide DCF with documentation of any such evaluation. The judge found that the mother was unable to appropriately reflect on her history of substance abuse, causing the judge concern that the mother might continue to struggle with substance abuse in the future, especially as the mother "was unable to demonstrate an understanding that a history of substance use requires ongoing efforts to remain sober."

The mother argues that the evidence does not establish a nexus between any alleged substance abuse and any harm to the child, which is required under Adoption of Katharine, 42 Mass. App. Ct. at 31, where the termination of parental rights turns

14

on substance abuse.  Here it did not.  The mother is correct that the judge said in one conclusion of law that "Mother has a history of domestic violence, mental health concerns, and substance abuse."  However, a close reading of the judge's decision makes clear that the primary concerns the judge had in finding the mother unfit to parent the subject child were the mother's mental health and her history of domestic violence, both as a victim and as a perpetrator with respect to her older children.  Additionally, to the extent the judge discussed substance abuse in her conclusions of law, she addressed only the fact that the mother denied and did not "take responsibility for her history of substance abuse concerns."  This was just one part of the judge's assessment that, if the mother did not view "introspection as important" -- including about her mental and physical health (and that of her children), domestic violence, and her physical abuse of her older child -- she would be unable to demonstrate growth and assure the safety of her children. Indeed, the mother's failure to recognize and address past concerns, including through noncooperation with DCF and refusal to allow it to access her home, is a primary theme of the judge's assessment of her fitness.  Thus, for example, in discussing whether the mother benefited from services, the judge concluded that the mother's unfitness was shown by her "inability to demonstrate that she will make the necessary

15

changes to address domestic violence, substance abuse, and mental health."

Nonetheless, given the gravity of the mother's other unaddressed concerns and clear and convincing evidence of unfitness, even if this use of the mother's substance abuse was in error under Adoption of Katharine, any error was harmless.

e. Best interests. Finally, the mother argues that the judge erred in concluding that termination would be in the child's best interests. Much of this argument relies on the claimed errors of fact we addressed above, and the claim that the mother's criminal history was stale. The mother also argues that the judge was required to find the mother had distanced herself from domestic violence, and the child faced no risk of domestic violence, since the mother had not had contact with father for six months at the time of trial. This argument has no merit, as the judge's findings on those matters were not clearly erroneous. The mother also argues it was error for the judge to find it would be detrimental for the child to return to the mother due to her bond with her foster family, as there were no findings that the mother would not be able to alleviate the harm that would ensue. But the judge's findings about the mother's lack of insight and inability to parent certainly suffice.

16

Given all of the above, we conclude that there was clear and convincing evidence supporting the trial judge's conclusion not only that the mother was unfit to parent the child, but that termination of the mother's parental rights was in the child's best interests.

2. <u>Placement</u>. In addition to her challenges to termination, the mother argues that the trial judge erred in failing to perform a meaningful evaluation of two competing adoption plans. When DCF and a parent put forward different adoption plans, the judge must consider both and "determine which placement will serve the best interests of the child." <u>Adoption of Dora</u>, 52 Mass. App. Ct. 472, 474-475 (2001). In deciding between two competing adoption plans, the judge must "'meaningfully . . . evaluate' what is proposed to be done for the child." <u>Id</u>. at 475, quoting <u>Adoption of Lars</u>, 46 Mass. App. Ct. 30, 31 (1998), <u>S.C.</u>, 431 Mass. 1151 (2000). Such an evaluation must be "even handed," regardless of which party offered the plan. <u>Adoption of Hugo</u>, 428 Mass. 219, 226 n.8 (1998), cert. denied sub nom. <u>Hugo P</u>. v. <u>George P</u>., 526 U.S. 1034 (1999).

This appeal was stayed to allow DCF to file in the trial court a "Motion to Reopen the Proceedings for Additional Evidence and Further Findings on the Best Interest of the Child," including an updated DCF proposed adoption plan. The

17

motion was allowed, and after taking additional evidence, the trial judge found DCF's plan to be in the child's best interest.

When Veronique was removed, she was originally placed with one foster family, but a few months later, in March 2019, she was placed with her current foster family, and she has lived with them since. The foster family was approved as a preadoptive resource in June 2020. A relative applied to be a preadoptive resource, but withdrew in 2020 due to family concerns. In October 2020, the child's great aunt came forward as a kinship placement for the child, and she expressed an interest in becoming a preadoptive resource. In October 2020, the mother moved to transfer the child's placement to a kinship placement, but the court declined to remove the child from her foster placement. The great aunt submitted her application in February 2021, and DCF referred her to a private agency for a home study in March 2021. In October 2021, the great aunt submitted a background check to the private agency, and the home study was approved in January 2022. This process took longer than usual due to an extensive waitlist resulting from the COVID-19 pandemic. The great aunt lives with her three grandchildren, and if the child were placed with them, she would share a room with the fourteen year old granddaughter.

In March 2022, DCF held an area clinical review team (ACRT) meeting to determine which adoption plan was in the child's best

interests.  After the ACRT meeting, in which DCF reviewed home studies from both placements and considered the length of time the child had been with the foster family, her attachment and connection with the family, her developmental growth, and the foster family's openness to safe and appropriate involvement with the child's biological family, DCF determined that the child should remain with her foster family.

The great aunt claims that she attempted to reach out to the DCF social worker on three occasions, but did not get a response.  The judge found that the great aunt may have called a phone number associated with DCF, but that the social worker did not receive any messages from the great aunt.  The judge also found that the great aunt's "minimal efforts to contact [the social worker] over the course of two years indicate a lack of commitment to developing a relationship with and taking custody of [the child]."  The great aunt visited the child a few times via Zoom and a few times in person when she was permitted to participate in the mother's visits.  According to the DCF social worker, the great aunt had not had any contact with the child "since before November 2021."  The great aunt testified that she did not have the bond with the child that she would have liked to have.  Based on this and, among other factors, the evidence of the child's "loving" bond with her foster family, the judge

concluded that adoption by the child's foster family was in her best interests.

The mother argues on appeal that the child's bond with her foster family was the decisive factor in the judge's decision and, as such, the judge was required, pursuant to Adoption of Katharine, 42 Mass. App. Ct. at 30-31, to address whether the child would be harmed by the severance of those bonds and whether that harm could be alleviated. However, the mother fails to recognize that Adoption of Katharine involved the decision to terminate parental rights, not the decision between two competing adoption plans. Id. at 27. The standard for termination of parental rights requires a stricter analysis because parents have a constitutional right, albeit not absolute, to maintain custody of their children. See id. See also Care & Protection of Erin, 443 Mass. at 570. A kinship placement with a relative who is not a parent, such as the great aunt in this case, differs because there is no constitutional right involved. See Adoption of Jacob, 99 Mass. App. Ct. 258, 268 (2021). Therefore, the considerations in Adoption of Katharine are not required for an evaluation of two competing adoption plans, even if one of the plans involves a kinship placement.

The mother next contends that the judge's evaluation of the competing adoption plans could not have been meaningful without

20

expert opinion as to the child's needs and any potential harm she would suffer if removed from her foster family. The mother contends that there was no clinical input at the ACRT meeting. The DCF social worker testified at first that he could not remember who was at the meeting other than "[m]yself, the area clinical manager, [and] my supervisor." He stated that the people who conducted the foster family's home study were not present at the ACRT meeting, nor was anyone from the private agency who had met with the great aunt. He later testified that there were more than three people at the meeting, but he could not remember who else was there. He did respond in the negative when asked whether there was "clinical input specific to how [the great aunt] could deal with the unique needs of [the child] transitioning to her home."

In support of her argument, the mother again cites Adoption of Katharine, which is inapplicable for the reasons stated above. DCF correctly notes that several cases have affirmed a choice between competing adoption plans, including cases choosing a foster placement over a kinship placement, without the requirement of expert opinion. See, e.g., Adoption of Jacob, 99 Mass. App. Ct. at 272; Adoption of Ilian, 91 Mass. App. Ct. 727, 731-732 (2017). Even in the context of termination of parental rights, which, as noted above, requires stricter analysis due to the constitutional rights at stake,

21

expert opinion regarding the child's bonds with the foster family is not required in all cases.  See, e.g., Adoption of Daniel, 58 Mass. App. Ct. 195, 202-203 (2003).

Finally, the mother argues that DCF failed to follow its own regulations regarding kinship placements, and for that reason the judge should not have adopted the ACRT's reasoning. We first note that the judge did not rely wholly on the ACRT's reasoning.  Although the judge did consider DCF's conclusions from the ACRT meeting, she also considered testimony from the DCF social worker, the child's foster mother, and the great aunt.

We cannot address the claim of the DCF's alleged failure to comply with its own regulations.  It appears to have been raised below in the motion to transfer the child to kinship placement, but when the mother's counsel withdrew, the judge withdrew that motion without prejudice to refiling by successor counsel.  The mother's successor counsel never refiled the motion or sought other remedies.  No request for a ruling was made, and no factual determinations concerning the regulations have been made in the trial court.  In these circumstances, the issue has not been preserved for review.  See Adoption of Jenna, 33 Mass. App. Ct. 739, 740-741 (1992).

In any event, even a failure by DCF to follow its own regulations would not be dispositive in the decision between two

22

competing adoption plans, as the judge must always rule in the child's best interest.  Adoption of Ilona, 459 Mass. 53, 61 (2011) (holding that even where DCF failed to make reasonable efforts to prevent or eliminate need for removal pursuant to G. L. c. 119, § 29C, judge must rule in child's best interests). Thus, even if DCF had "deliberately attempted to thwart the applications of the child's relatives," of which there is no evidence here, "frustration with the department does not justify an inappropriate placement," which would amount to "penalizing the child."  Adoption of Irene, 54 Mass. App. Ct. 613, 623 (2002).

DCF was not required to place the child with the great aunt in 2020 when the great aunt came forward, more than a year and a half after the placement of the child with her current foster parents.  To the extent it is challenged, there was no abuse of discretion or other error of law in the judge's withdrawal, without prejudice at the time of counsel's withdrawal, of the 2020 motion by the mother for a kinship placement.  Nor was there any abuse of discretion or clear error of law in the judge's decision that DCF's adoption plan, which will place the child permanently with the foster family with whom she has lived

23

since she was less than four months old, was in the child's best interests.

                                   <u>Decree, as modified by the judge's April 20, 2023, supplemental findings of fact, conclusions of law, and order, affirmed</u>.

                                   By the Court (Rubin, Englander & D'Angelo, JJ.[5]),

                                   Paul Little

                                   Clerk

Entered:  August 14, 2024.

---

[5] The panelists are listed in order of seniority.